**Jason K. Singleton,** State Bar #166170
jason@singletonlawgroup.com
**Richard E. Grabowski,** State Bar #236207
rgrabowski@mckinleyville.net
**SINGLETON LAW GROUP**
**611 "L" Street, Suite A**
**Eureka, CA 95501**

**(707) 441-1177**
**FAX  441-1533**

**Attorneys for Plaintiff, ASIS INTERNET SERVICES**

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIS INTERNET SERVICES, a California corporation <br><br>     Plaintiff, <br><br> vs. <br><br> MEMBER SOURCE MEDIA, LLC, a California limited liability company, et al., <br><br>     Defendants. | Case No.  CV-08-1321 EMC <br><br> **MOTION TO AMEND COMPLAINT** <br><br> **DATE:  August 20, 2008** <br> **TIME:    10:30 AM** <br> **CTRM:  C, 15TH FLOOR** |

# TABLE OF CONTENTS

**NOTICE OF MOTION AND MOTION** .... ......... .................. ......... ......... ......... ......... **1**

**MEMORANDUM  OF POINTS AND AUTHORITIES** ............ ......... ......... ......... ......... **1**

**1.**    **Legal Standard for a request to amend complaint** *FRCP* **Rule 15(a)(2) and**
      ***US Court Order* 30.** ......... ......... ......... .................. ......... ......... ......... **1**

**2.**    **Plaintiff's purpose in requesting the amendment is to allow the Court to**
      **resolve the jurisdiction issue relating to adverse affect.** .. ......... ......... ......... ........ **2**

**3.**    **The additional emails are the same type transaction as the original emails**
      **complained of in the Complaint** ......... .................. ......... ......... ......... ......... ........ **2**

**4.**    **Plaintiff's FAC will provide facts sufficient to decide the jurisdictional issues** ....... **3**

**5.**    **Plaintiff's amended FAC is not futile as it provides facts that meet the**
      **requirements of the** *CAN SPAM Act of 2003* **for standing by an Internet**
      **Access Provider (hereafter "IAP").** ..... .................. ......... ......... ......... ........ **4**

   **a.**    **What is the definition of standing for an IAP under the** *CAN*
         *SPAM Act of 2003* **(15** *USC* **§7706(g)(1))** ........ ......... ......... ......... ........ **4**

   **b.**    **Article III Standing** ......... ......... .................. ......... ......... ......... ........ **4**

   **c.**    **The Statutory Standing issues are the same as Article III**
         **standing in this case distinguished by degree.** ...... ......... ......... ........ **5**

   **d.**    **ASIS is the type of entity defined as having standing.** ...... ......... ......... ........ **6**

   **e.**    **ASIS was harmed by the 5006 emails that were allegedly**
         **sent by or on behalf of Defendant.** ................ ......... ......... ......... ........ **6**

   **f.**    **What is adverse affect and how does it affect statutory standing?** ...... ........ **7**

   **g.**    **The analysis and statutory construction for standing in** *ASIS vs.*
         *Optin Global* **is flawed.** ... ......... .................. ......... ......... ......... ......... ......**11**

**CONCLUSION**        ......... ......... ......... ......... .................. ......... ......... ......... ......... ......**13**

# TABLE OF AUTHORITIES

## CASES

*ASIS Internet Services v. Optin Global, Inc.*, Slip Copy, 2008 WL 1902217
  (N.D.Cal., 2008) ..............................................................................................11, 12
*B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir., 1999) ...............................3
*Bernhardt v. County of Los Angeles*, 279 F.3d 862 at 868 (9th Cir., 2002) ......................3, 5
*Cetacean Community v. Bush*, 386 F.3d 1169 at 1175 (9th Cir., 2004).......................4, 5, 10
*DCD Programs, Ltd. v. Leighton*, 833 F.2d 183 at 186 (9th Cir., 1987) ...........................1, 2
*Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1 at 11 (2004) ...................................5
*Gordon v. Virtumundo, Inc.*, 2007 WL 1459395 (W.D. Wash. May 15, 2007) .....................11
*Green Apartments L.L.C. v. City of Tacoma*, 241 F.3d 1235, 1239 (9th Cir., 2001)..............5
*Hypertouch, Inc. v. Kennedy-Western University*, 2006 WL 648688 at 4
  (N.D.Cal., 2006) ..................................................................................................11
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 580 (1992) ..............................4, 7, 8, 9
*Massachusetts v. E.P.A.*, 127 S.Ct. 1438 at 1453 (2007) ......................................4, 7
*US vs. Member Source Media LLC*, Case No. CV 08-642-MEJ (ND CA, January 30,
  2008) ..........................................................................................................3
*Warth v. Seldin*, 422 U.S. 490 at 500 (1975) ..................................................5, 9

## STATUTES

15 *USC* §7701(1)–(12) .............................................................................................9
15 *USC* §7701(6) ...........................................................................................7, 8, 12
15 *USC* §7701(b) .................................................................................................9
15 *USC* §7704 ....................................................................................................4
15 *USC* §7704(a) and (b)........................................................................................6
15 *USC* §7706(g) .................................................................................................9
15 *USC* §7706(g)(1) ....................................................................................... passim
15 *USC* §7706(g)(3)(A) ....................................................................................8, 12
*CAN SPAM Act of 2003* ................................................................................... passim
US Court Order 30 .................................................................................................1

## RULES

*FRCP* Rule 15 (c)(1)(B) ...........................................................................................3
*FRCP* Rule 15(a)(2) ............................................................................................1, 3
*FRCP* Rule 15(d) ...................................................................................................1

## OTHER AUTHORITIES

FTC Staff Report:  *Spam Summit: The Next Generation of Threats and Solutions*,
  November 2007 .....................................................................................................12
Ironport Systems, Inc.: *Internet Security Trends for 2007, A Report on Spam,
  Viruses and Spyware*, by Tom Gillis..........................................................................10, 12
S. REP. NO. 108-102, at 22 (2003) (Comm. Rep. on *CAN-SPAM Act of 2003* (S.877)) ...8, 11

**NOTICE OF MOTION AND MOTION**:

To:     Defendant, **MEMBER SOURCE MEDIA, LLC**, and its attorney of record:

Please take notice that on August 20, 2008, at 10:30 a.m., or as soon thereafter as counsel may be heard by the above entitled Court, located in Courtroom C, 15th Floor, 450 Golden Gate Avenue, San Francisco, California, Plaintiff will and hereby does move the Court for an order permitting Plaintiff to amend the Complaint with additional emails and additional information as to how Plaintiff was adversely affected by Defendant's SPAM emails.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, and upon such other matters as may be presented to the Court at the time of the hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff brings this request for permission to amend its Complaint to add additional transactions of the same nature and in order to provide sufficient facts to the Court to allow the Court to rule on the issues of **Article III** and statutory standing as they relate to the ***CAN SPAM Act of 2003***.

**1.     Legal Standard for a request to amend complaint *FRCP* Rule 15(a)(2) and US Court Order 30.**

***FRCP*** Rule 15(d) states that the court may permit a party to "amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."  The 9th Circuit has noted that the Supreme Court has instructed the lower courts to carefully follow Rule 15(a) by freely granting leave to amend when justice so requires.  "Thus rule 15's policy of favoring amendments to pleadings should be applied with extreme liberality."  ***DCD Programs, Ltd. v. Leighton***, 833 F.2d 183 at 186 (9th Cir., 1987); quotations and citations omitted.

Plaintiff has advised Defendant of Plaintiff's intention to move to amend.  Therefore it is within the Court's authority to allow the amendment.

Limitations to allowing amendment are "the complaint does not cause the opposing party undue prejudice, is not sought in bad faith, and does not constitute an exercise in futility."

1
2
3

***DCD Programs, Ltd. v. Leighton***, 833 F.2d 183 at 186 (9th Cir., 1987); citations omitted.  The fourth factor of undue delay is also considered but with less weight than the other three factors. ***Ibid.***

4
5

**2.    Plaintiff's purpose in requesting the amendment is to allow the Court to resolve the jurisdiction issue relating to adverse affect.**

6
7
8
9
10
11
12
13
14
15
16

Plaintiff has two purposes in making this motion to amend.  First Plaintiff has discovered an additional 558 emails sent on behalf of Defendant through May 5, 2008.  This increases the total number of emails complained of to 5,564 and extends the date received to May 5, 2008. Plaintiff's second purpose in requesting the proposed amendment is to provide sufficient facts so as to allow the Court to decide the issues of **Article III** and statutory standing as they relate to the requirement for "adverse affect" in 15 ***USC*** §7706(g)(1).  This is purely a legal issue as to the definition of "adverse affect".  Therefore this motion is not brought in bad faith and does not represent prejudice to Defendant.  Finally, since the issue will dispose of the jurisdiction issue at the earliest point in the case it does not represent an undue delay.   There has been no discovery in this case so the additional emails do not represent any delay or prejudice to Defendant.

17
18
19

However, Plaintiff anticipates that Defendant will claim that the adverse affect facts provided by Plaintiff in the FAC make the issue futile as Defendant will argue that the facts demonstrate Plaintiff lacks standing.  Plaintiff disputes this claim below.

20
21

**3.    The additional emails are the same type transaction as the original emails complained of in the Complaint.**

22
23
24

Plaintiff has discovered through additional investigation 558 additional emails, received through May 5, 2008, that are the same transaction type as those complained of in the original Complaint.

25
26
27

These emails were identified by using a more sophisticated search criteria that was able to decode the message body to detect URLs and addresses that were intentionally obfuscated by the email sender.

28

These additional emails, with the exception of the obfuscation techniques used, are the

same as the original emails complained of by Plaintiff.  With one exception.  Plaintiff also received an email on May 5, 2008.  All of the prior emails had been received prior to January 31, 2008.   This email is similar in nature in that it  is a promotion for Premium Perks.com, and contains false headers and a misleading subject line.  See email in Exhibit A attached hereto.  Plaintiff had assumed that the emails were stopped on January 31, 2008, in compliance with the Stipulated Final Judgment issued in *US vs. Member Source Media LLC*, Case No. CV 08-642-MEJ (ND CA, January 30, 2008) prohibiting any further violations of the *CAN SPAM Act of 2003*.  Courtesy copy attached.  Apparently Defendant has determined to defy the Court Order and more emails have been sent.

Therefore, since these new emails relate back to the conduct in the original complaint and do not represent a burden on the Defendant, the Court should allow the amendment.  *FRCP* Rule 15(a)(2) and (c)(1)(B).

## 4.    Plaintiff's FAC will provide facts sufficient to decide the jurisdictional issues.

Plaintiff has attached a draft copy of the First Amended Complaint (hereafter "FAC") to this motion.  The new portions of the FAC occur in paragraphs 10 and 11.  Plaintiff revised Paragraph 10 with the following statement:  "Plaintiff states that it was adversely affected by having to process the emails over their servers and by having their agents investigate the offending emails."  Plaintiff added paragraph 11 that provides specific facts as to how Plaintiff was adversely affected.  Those facts will be supported at the time of filing by a Declaration from Nella White, president of ASIS, attached to the FAC.

Plaintiff asserts that these additional facts provide the necessary information to decide the **Article III** and statutory standing issues in this matter.

From these facts the Court can decide the jurisdictional issues sua sponte.  When one or both parties introduce jurisdictional issues the court must decide those issues before proceeding.  "[F]ederal courts are required sua sponte to examine jurisdictional issues such as standing ."  *Bernhardt v. County of Los Angeles*,279 F.3d 862 at 868 (9th Cir., 2002); quoting *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir., 1999).

**5.      Plaintiff's amended FAC is not futile as it provides facts that meet the requirements of the *CAN SPAM Act of 2003* for standing by an Internet Access Provider (hereafter "IAP").**

      **a.      What is the definition of standing for an IAP under the *CAN SPAM ACT of 2003* (15 *USC* §7706(g)(1))?**

Congress has authorized "[a] provider of Internet access service adversely affected by a violation…" of various sections of 15 *USC* §7704 with standing to bring an action.  15 *USC* §7706(g)(1).  The Congress has the authority to enact legislation that confers standing on a plaintiff based on harm as defined in that statute.  "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before…" ***Massachusetts v. E.P.A.***, 127 S.Ct. 1438 at 1453 (2007); citing ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 580 (1992).  A party must establish both **Article III** standing and statutory standing where standing is conferred by legislative action.  ***Cetacean Community v. Bush***, 386 F.3d 1169 at 1175 (9th Cir., 2004).

      **b.      Article III Standing.**

To establish standing the party bringing suit "must show that the action injures him in a concrete and personal way… assuring both that the parties before the court have an actual, as opposed to professed, stake in the outcome…" ***Massachusetts v. E.P.A.***, 127 S.Ct. 1438 at 1453 (2007); citing ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 580 (1992).  Further, the plaintiff must show "that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury."

The Congress has the power to define standing by statute.  ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 578 (1992).  In exercising its power to define standing by statute the Congress must "at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." ***Massachusetts v. E.P.A.***, 127 S.Ct. 1438 at 1453 (2007); citing ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 580 (1992).

Therefore to establish **Article III** standing ASIS must demonstrate that it is the type of party identified by the legislature, that it has suffered the type of harm defined by the legislature and how that harm is related to Defendant and Plaintiff and this cause of action.

**c.    The Statutory Standing issues are the same as Article III standing in this case distinguished by degree.**

Once a party has suffered sufficient injury to satisfy Article III standing the court must decide if the congress has provided non-constitutional standing for that plaintiff.  ***Cetacean Community v. Bush***, 386 F.3d 1169 at 1175 (9th Cir., 2004).  "Non-constitutional standing exists when a particular plaintiff has been granted a right to sue by the specific statute under which he or she brings suit."  ***Ibid.*** (quotations and citation omitted).  "To ensure enforcement of statutorily created duties, Congress may confer standing as it sees fit on any plaintiff who satisfies Article III."  ***Ibid.*** (quotations and citation omitted).

Statutory standing in this case falls within the definition of prudential standing as it revolves around the issue of whether there is a judicially imposed limitation on the court's exercise of jurisdiction.  ***Elk Grove Unified School Dist. v. Newdow***, 542 U.S. 1 at 11 (2004).  That is the "statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  ***Warth v. Seldin***, 422 U.S. 490 at 500 (1975).  "To satisfy prudential standing requirements, the plaintiff also must show she falls within the 'zone of interests' of the applicable law." ***Bernhardt v. County of Los Angeles***, 279 F.3d 862 at 868 (9th Cir., 2002); citing ***Green Apartments L.L.C. v. City of Tacoma***, 241 F.3d 1235, 1239 (9th Cir., 2001).  Therefore to establish statutory standing the plaintiff must show they fall within the zone of interest of the applicable law such that the plaintiff has a right to judicial relief.

The zone of interest can be defined as the type of person designated by the statute and whether they suffered the type of harm defined in the statute.  ***Cetacean Community v. Bush***, 386 F.3d 1169 at 1178 (9th Cir., 2004).  The ***Cetacean Community*** Court further found:

> [T]he zone of interests test is not meant to be especially demanding, and a court should deny standing only if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.  ***id.*** at 1177 (quotations omitted).

As discussed in detail below ASIS is a provider of Internet access as described in 15 ***USC*** §7706(g)(1).  As further discussed below ASIS received and processed 5,564 SPAM

1   emails that are allegedly in violation of 15 *USC* §7704(a) and (b).

2       As discussed below, ASIS is the type of entity designated by the statute, therefore the

3   remaining issue concerns whether ASIS suffered the type of harm stated in the statute.  This is

4   the same issue as that of **Article III** standing.  The difference lies only in the matter of degree.

5   That is does the statute define some level of harm that is significantly greater than that

6   required for **Article III** standing.  Plaintiff argues that it does not.

7       However, in considering these issues, since **Article III** standing is a constitutional

8   jurisdiction issue it is preeminent to all other issues before the court.  Therefore the  Court

9   must consider **Article III** standing and only once it finds **Article III** standing can it consider

10  statutory standing.  Since the issues are so closely related and the requirements for **Article III**

11  standing are more stringent, Plaintiff will argue the issue from the point of **Article III** standing

12  and then from the point of statutory standing.

13      **d.      ASIS is the type of entity defined as having standing.**

14      It is undisputed that ASIS was sent and received the emails and that ASIS has a stake

15  in the outcome of the suit.  Samples of the emails were provided as part of the Complaint,

16  (Exhibit D) and Plaintiff has alleged the emails were sent to its email servers FAC ¶ 11.

17      The Congress has identified the class of persons with standing as providers of Internet

18  access services.  15 *USC* §7706(g)(1).  Plaintiff, ASIS Internet Services, has alleged that it is

19  provider of Internet access services and email services.  Complaint ¶8.  Therefore ASIS is

20  within the class of persons identified as having standing under the statute.

21      **e.      ASIS was harmed by the 5006 emails that were allegedly sent
                 by or on behalf of Defendant.**

22

23      ASIS stated in the FAC that it received and processed the SPAM emails in this suit on

24  its filtering service and on its email server.  ASIS further states that it costs approximately

25  $3,000 per month to process SPAM emails in both processing and employee costs.  FAC ¶ 11.

26  ASIS receives approximately 200,000 SPAM emails per day to all of its and its customers

27  email accounts (both active and inactive).  This is roughly 6,000,000 emails per month.

28  Therefore ASIS suffers an approximate cost less than $.01 per email.  This amount varies

based on the amount of employee time spent on customer complaints or investigating the emails.  Although the cost per email is small it is real, if Plaintiff stopped processing the emails, they would flood its servers and end up in its customer's email inboxes.  This would put Plaintiff out of business in a very short time.

Therefore the harm to Plaintiff is concrete and affects ASIS in a personal way such that it assures the court that ASIS has an actual stake in the outcome of the suit.  That is if the emails were stopped through injunction or the imposition of statutory penalties, ASIS's burden would be reduced.  Plaintiff has alleged and provided evidence that the emails are traceable to Defendant.  FAC ¶ 19 and 24.  Since the Plaintiff has requested both an injunction to prevent further emails being sent and statutory penalties the Court can remedy the matter.  Therefore the harm is traceable to Defendant and a favorable ruling by the Court will redress the injury.

Therefore Plaintiff, ASIS, has established a sufficient basis for **Article III** standing.

### f.    What is adverse affect and how does it affect statutory standing?

15 **USC** §7706(g)(1) defines the requisite injury as "adversely affected."  In exercising its power to define standing by statute the Congress must "at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." *Massachusetts v. E.P.A.*, 127 S.Ct. 1438 at 1453 (2007); citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 580 (1992).

Congress defined the type of harm that the *CAN SPAM Act* was intended to vindicate:

> (6)    The growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions that carry and receive such mail, as there is a finite volume of mail that such providers, businesses, and institutions can handle without further investment in infrastructure.  15 **USC** §7701(6).

This indicates that the type of harm Congress was intending to regulate was the monetary costs of providers having to carry increasingly larger volumes of emails.  Congress related the injury to IAPs in a very limited manner as "adversely affected."  15 **USC** §7706(g)(1).  The penalties section of the Act further explains this definition:

> For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message that is transmitted or attempted to be transmitted *over the facilities of the provider of Internet access service*… 15 **USC** §7706(g)(3)(A).  (emphasis added)

The text of the **CAN SPAM Act** clearly points to the harm as the cost of carrying SPAM emails over the IAP's facilities.  In addition, penalties are allowed for even attempting to send unlawful emails, implying that it may not even be necessary for the IAP to have received the emails.

The legislative record further confirms the meaning of adverse affect.  **S. REP. NO. 108-102**, at 22 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877)) states:

> Section 7(f) would allow a provider of Internet access service adversely affected by a violation of section 5 to bring a civil action in Federal district court or other court of competent jurisdiction. This could include a service provider who carried unlawful spam over its facilities, or who operated a website or online service from which recipient e-mail addresses were harvested in connection with a violation of section 5(b)(1)(A)(i). (Emphasis added).[1]

This portion of the legislative record clearly indicates that the type of harm contemplated for enforcement is "carrying the unlawful spam over" the IAP's facilities.  This correlates exactly with the language in the statute at 15 **USC** §7706(g)(3)(A) and 15 **USC** §7701(6).  This portion of the legislative history appears in the section labeled "Section 7. Enforcement by the Federal Trade Commission."[2]

Further, it is likely that even this level of harm is not necessary as **Article III** standing can be created by Congress by creating a right and the invasion of that right.  The Court in **Lujan** stated: "Nothing in this contradicts the principle that '[t]he ... injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' ' " **Lujan v. Defenders of Wildlife**, 504 U.S. 555 at 578 (1992); citing **Warth v.**

---

[1] It should be noted that ASIS complained of and produced evidence of a directory harvest related to this matter. See **FAC ¶¶ 25 and 26**.

[2] Even though labeled under the FTC this section also includes enforcement by State Attorney Generals and IAPs.  See **S. REP. NO. 108-102**, at 22 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877)).

1   **Seldin**, 422 U.S. 490 at 500 (1975).  As examples the Court cited:  "individual's personal

2   interest in living in a racially integrated community,… and injury to a company's interest in

3   marketing its product free from competition."  **Lujan v. Defenders of Wildlife**, 504 U.S. 555 at

4   578 (1992).  In the **CAN SPAM Act of 2003** (15 **USC** §7706(g)) the Congress intended to

5   create a legal right for IAPs not to be spammed and empowered IAPs to enforce that right.

6   Invasion of that right therefore creates both **Article III** and statutory standing.

7       Congress not only intended to create a legal right it intended that right as a deterrent to

8   SPAM.  Congress empowered plaintiff Internet access providers as private attorney generals

9   to prosecute spammers in the war on SPAM.  15 **USC** §7706(g).  It is clear that plaintiff

10  Internet access providers are one of the chosen vindicators of a policy considered highly

11  important by the Congress.   This analysis is supported by the language in 15 **USC**

12  §7706(g)(3)(A) that allows penalties for even attempting to send emails over and IAP's

13  facilities.

14      The Congress found that there was significant harm in the sending of bulk email with

15  certain characteristics such as false headers, misleading subject lines, pornography, and other

16  harms.  15 **USC** §7701(1)–(12).  Congress determined that there is a substantial government

17  interest in regulating bulk email. 15 **USC** §7701(b).  Congress created a private right of action

18  and provided an incentive to IAPs to pursue litigation against SPAMMERS and Advertisers

19  hiring SPAMMERS to assist in regulating bulk email.  15 **USC** §7706(g).  Therefore the

20  purpose of the **CAN SPAM Act of 2003** is to stop the sending of SPAM and IAPs have been

21  chosen to help implement that objective.

22      Defendants have argued that there is no relationship between the amount of actual

23  damages caused by a set of SPAM emails and the amount an IAP can recover as statutory

24  penalties.  It is clear that Congress did not intend to just compensate IAPs for their losses.

25  The intent of the **CAN SPAM Act** is to stop the spamming and the Act recognizes the difficulty

26  in achieving this objective.  The statutory penalties and injunction are designed to provide a

27  disincentive to SPAMMERS while providing an incentive to IAPs to haul SPAMMERS into

28  court.  If IAPs are required to show large actual damage losses in order to bring suit, then the

1    intent to stop spamming will be defeated.

2        The amount of SPAM has not decreased it has increased at astronomical rates.

3    Ironport Systems Inc., an Internet security firm, reports that in 2005 SPAM volumes increased

4    by 200%, that volumes more than tripled in 2006, and that SPAM volumes would more than

5    double in 2007.  This required a 300 percent increase in email gateway capacity in 2006 over

6    2005.  **Ironport Systems, Inc.**: *Internet Security Trends for 2007*, *A Report on Spam, Viruses*

7    *and Spyware*, by Tom Gillis, 2007 P 3 (courtesy copy attached).

8        There is no indication that the purpose of the **CAN SPAM Act** is to compensate IAPs for

9    their losses, or that suits should be related to actual losses of the IAPs.  The harm described

10   by the Congress is the cumulative harm of receiving ever greater loads of SPAM.  That harm

11   has occurred and still occurs today.   Just because IAPs now have SPAM filters, more

12   processors, etc. does not mean the harm has stopped.  The harm, that is the cost to the IAPs,

13   is just spread over a significantly larger and growing amount of SPAM.  The objective of the

14   Act is to stop the ever increasing load of SPAM.  The Congress defined that harm as affecting

15   IAPs who are forced to carry the SPAM over their facilities.

16       The 9th Circuit in relation to statutory standing has ruled:  "a court should deny standing

17   only if the plaintiff's interests are so marginally related to or inconsistent with the purposes

18   implicit in the statute that it cannot reasonably be assumed that Congress intended to permit

19   the suit."   **Cetacean Community v. Bush**, 386 F.3d 1169 at 1177 (9th Cir., 2004).  An action

20   to sue SPAMMERS is described in the **CAN SPAM Act** and therefore cannot be inconsistent

21   with the purposes of the Act.  It is hard to believe that an IAP, who has received and processed

22   thousands of SPAM emails, is so marginally related to the purposes of the **CAN SPAM Act of**

23   **2003** that it can be reasonably assumed that Congress did not intend to permit this suit.

24   Therefore ASIS is within the zone of interest of the **CAN SPAM Act of 2003**.

25       Therefore an IAP is adversely affected by carrying SPAM emails over their facilities.

26   Therefore Plaintiff, ASIS, by receiving and processing the emails is within the zone of interest

27   of the statute and has statutory standing.

28   ///

**g.    The analysis and  statutory construction for standing in ASIS vs. Optin Global is flawed.**

The **ASIS v. Optin Global** Court defined "adversely affected" as "a particular type of harm and that harm is 'significant'." **ASIS Internet Services v. Optin Global, Inc.**, Slip Copy, 2008 WL 1902217 at 17 (N.D.Cal., 2008); courtesy copy attached.  The **Optin Global** Court erred in this construction.

The **Optin Global** Court relies heavily on the legislative history as discussed below. The **Optin Global** Court also relied heavily on **Gordon v. Virtumundo, Inc.**, 2007 WL 1459395 (W.D. Wash. May 15, 2007) in its decision.  The **Optin Global** Court and the **Gordon** Court both cite **Hypertouch, Inc. v. Kennedy-Western University**, 2006 WL 648688 at 4 (N.D.Cal., 2006) citing the text: Hypertouch "submitted a declaration 'indicating that high spam loads had caused decrease server response and crashes, led to higher bandwidth utilization, and forced expensive hardware and software upgrades.'" **ASIS Internet Services v. Optin Global, Inc.**, Slip Copy, 2008 WL 1902217 at 15 (N.D.Cal., 2008)

Both the **Optin Global** Court and the **Gordon** Court noted that the Congress described the harm caused by SPAM as:

> "[s]pam imposes significant economic burdens on ISPs, consumers and businesses" because "[m]assive volumes of spam can clog a computer network, slowing Internet service for those who share that network. ISPs must respond to rising volumes of spam by investing in new equipment to increase capacity and customer service personnel to deal with increased subscriber complaints." **ASIS Internet Services v. Optin Global, Inc.**, Slip Copy, 2008 WL 1902217 at 16 (N.D.Cal.,2008);  **Gordon v. Virtumundo, Inc.**, 2007 WL 1459395 at 6 (W.D. Wash. May 15, 2007); citing **S. REP. NO. 108-102**, at 6 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877)).

The **Optin Global** Court used this text to justify its statutory construction of adverse affect.  There is no support for use of this language in the statute.

This section of text appears under the title "Costs to ISPs, Consumers, and Businesses." **S. REP. NO. 108-102**, at 6 (2003) (Comm. Rep. on **CAN-SPAM Act of 2003** (S.877)).  It does not appear in the section of the report labeled "Section 7. Enforcement by the Federal Trade Commission." **ibid.** at 22.  The language cited by the **Optin Global** Court

1    appears in the portion of the legislative report where the Senate was considering the problem,

2    not where the Senate was describing the solution and is therefore less applicable to the issue.

3        This citation to the Senate Report also represents the state of technology and

4    investment by IAPs in 2003.  This does not represent the environment today.

5        The Federal Trade Commission reports that SPAM filters used by IAPs effectively block

6    the vast majority of SPAM sent to harvested email accounts.  **FTC Staff Report:**  *Spam*

7    *Summit: The Next Generation of Threats and Solutions*, November 2007, P A-1.  (Courtesy

8    copy attached)  Because IAPs have improved their networks, increased bandwidth and server

9    capacity, and installed SPAM filtering processes they no longer experience server crashes

10   based on spam attacks. ***Id.***

11       As discussed above the rate of SPAM has not decreased it has increased at

12   astronomical rates.  **Ironport Systems, Inc.**: *Internet Security Trends For 2007*, *A Report on*

13   *Spam, Viruses and Spyware*, by Tom Gillis, 2007 P 3 (courtesy copy attached).

14       Because the environment has changed it is unlikely that any provider of Internet access

15   services will ever have standing to bring a suit under the ***CAN SPAM Act*** using the ***Optin***

16   ***Global*** Court's definition of "adverse affect".  IAPs, including ASIS, have put into place filtering

17   systems, better networks, more processing capacity and staffs to handle complaints. ***ASIS***

18   ***Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 at 3 (N.D.Cal., 2008)

19   Servers and networks no longer crash.  Customers do not see the great majority of SPAM.

20   Businesses manage their expenses so that there are minimal surprise increases in cost.  Even

21   so, IAPs must continue to spend resources, at a growing rate, in order to stop the increasing

22   onslaught of SPAM.  This is exactly what the legislature predicted and exactly what they

23   intended to prevent by the ***CAN SPAM Act of 2003***.

24       There is no other language in the ***CAN SPAM Act*** to support the District Court's

25   construction.  There is specific language in the Act to support the alternative construction

26   offered by ASIS in 15 ***USC*** §7701(6) and 15 ***USC*** §7706(g)(3)(A).  Therefore the construction

27   by the ***Optin Global*** Court is not supported by the plain language of the Act.

28       The ***Optin Global*** Court relied on specific portions of the legislative record and

1    overlooked other more relevant sections.  The **Optin Global** Court overlooked the very clear

2    language of the legislative record that contradicted its interpretation.  The **Optin Global** Court

3    overlooked the plain language of the statue that contradicted its interpretation.  The **Optin**

4    **Global** Court overlooked the objectives and goals of the **CAN SPAM Act.**  Therefore the

5    **Optin Global** Court has erred in its construction of the statutory language.  If this Court finds

6    that the **Optin Global** Court's definition of adverse affect is correct, then the intent of the

7    legislature to protect the IAPs and stop the SPAM will have been thwarted.

8                                              **CONCLUSION**

9            The intent of the **CAN SPAM Act of 2003** is to stop illegal spamming.  If IAP's, such as

10    ASIS, who have received thousands of SPAM emails do not qualify then the purposes of the

11    Act will be thwarted.  The Court should allow Plaintiff to add the additional emails and modify

12    the date of receipt.  The Court should allow Plaintiff's adverse affect amendments to the

13    Complaint and should find that the definition for adverse affect consists of carrying SPAM

14    emails over the IAP's facilities.  Further, the Court should find that ASIS meets the requirements

15    of adverse affect and has established standing to bring this action.

16                                          **SINGLETON LAW GROUP**

17

18    Dated:        July 16, 2008                   /s/ Jason K. Singleton
                                                    Jason K. Singleton
19                                                  Richard E. Grabowski, Attorneys for Plaintiff,
                                                    **ASIS INTERNET SERVICES**
20

21

22

23

24

25

26

27

28

**NG** _____

| | |
|---|---|
| **From:** | "Salestoday" <Salestoday@moviesyesterday.com> |
| **To:** | <redacted@asis.com> |
| **Sent:** | Monday, May 05, 2008 1:59 PM |
| **Subject:** | TARGET (R) 500 Dollar Gift Card Inside - Use Instore or Online |

Reference #TAR-1030

TARGET (R) 500 Dollar Gift Card Inside - Use Instore or Online

Get a Target (R) 500 Dollar Gift Card sent to you for being part of our simple program and participating in our sponsors offers.

http://moviesyesterday.com/c/RgSu8v80P9vHpHh5MNx_Lg.html?0

----------------------------------------------------------------

To Stop Receiving Announcements from PremiumPerks.com:

http://moviesyesterday.com/c/RgSu8v80P9vHpHh5MNx_Lg.html?1

PremiumPerks.com

1325 Howard Ave. #103

Burlingame, CA 94010.

This is an announcement. This promotion is conducted exclusively by PremiumPerks.com and is subject to participation the terms and the conditions. Offer not available to residents of Ohio and is void where prohibited by law.

To receive the incentive gift you must: 1) register with valid information; 2) complete the user survey;

3) complete 6 Best of the Net offers ?2 in each section. Purchase may be required. Upon completion of all requirements, we will ship your incentive gift to your verified shipping address. Trademarks, service marks, logos and/or domane names (including, with limitation, the individual names of products and companies) are the property of their respective owners, who have no association with and do not make any endorsement of their listed products or services. This email was sent by an affiliate of PremiumPerks.com. If you want to stop receiving announcements from this affiliate?s list please follow their instructions below.

To remove yourself from this list,Enter  here
http://moviesyesterday.com/u/RgSu8v80P9vHpHh5MNx_Lg.html or write to us at:73 Spring street, NY, NY suite 505, 10012

**Jason K. Singleton,** State Bar #166170
jason@singletonlawgroup.com
**Richard E. Grabowski,** State Bar #236207
rgrabowski@mckinleyville.net
**SINGLETON LAW GROUP**
**611 "L" Street, Suite A**
**Eureka, CA 95501**

**(707) 441-1177**
**FAX  441-1533**

**Attorneys for Plaintiff, ASIS INTERNET SERVICES**

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASIS INTERNET SERVICES, a California corporation**<br><br>        **Plaintiff,**<br>**vs.**<br><br>**MEMBER SOURCE MEDIA, LLC, a California limited liability company, dba PREMIUM PERKS (aka PREMIUMPERKS.COM), also dba ONLINE REWARD GROUP (aka ONLINEREWARDGROUP.COM), also dba FREE RETAIL REWARDS (aka FREERETAILREWARDS.COM), also dba GREAT AMERICAN GIVEAWAYS (aka GREATAMERICANGIVEAWAYS.COM), also dba CONSUMER GAIN (aka CONSUMERGAIN.COM), and DOES ONE through FIFTY, inclusive,**<br><br>        **Defendants.** | **Case No. C-08-1321 EMC**<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – VIOLATION OF CAN-SPAM ACT OF 2003 [15 *USC* §7701, *et seq.*] AND CALIFORNIA BUSINESS & PROFESSIONS CODE §17529.5**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff **ASIS INTERNET SERVICES, a California corporation,** and a provider of Internet Access, complains of Defendants **MEMBER SOURCE MEDIA, LLC, a California limited liability company, dba PREMIUM PERKS (aka PREMIUMPERKS.COM), also dba ONLINE REWARD GROUP (aka ONLINEREWARDGROUP.COM), also dba FREE RETAIL REWARDS (aka FREERETAILREWARDS.COM), also dba GREAT AMERICAN GIVEAWAYS (aka GREATAMERICANGIVEAWAYS.COM), also dba CONSUMER GAIN**

1  **(aka CONSUMERGAIN.COM), and DOES ONE through FIFTY, inclusive**, and alleges

2  violations of **CAN-SPAM Act, 15 U.S.C. §7704(a) and (b)** and **California Business and**

3  **Professions Code §17529.5(a)** and requests injunctive relief, liquidated damages, statutory

4  damages, aggravated damages, and attorney fees authorized as remedies under **15 USC**

5  **§7706(g)** and **California Business and Professions Code § 17529.5(b)(1)(B)**.

6  <u>**JURISDICTION AND VENUE**</u>

7  1.    This Court has original jurisdiction of this action pursuant to **28 USC §1331** for

8  violations of the **CAN-SPAM Act of 2003 (15 USC §§7701 et seq.).**    This Court also has

9  original jurisdiction under **15 USC §7706(g)(1)** for cases involving a civil action by an **internet**

10  **access provider** adversely affected by a violation of section **15 USC §7704(a)(1), 15 USC**

11  **§7704(b), or 15 USC §7704(d)**, or a pattern or practice that violates paragraphs **(2), (3), (4), or**

12  **(5) of 15 U.S.C. §7704(a).**    Pursuant to pendent jurisdiction, attendant and related causes of

13  action, arising from the same facts, are also brought under California law, including, but not

14  limited to, violations of **California Business & Professions Code** §17529.5.

15  2.    This Court has personal jurisdiction over Defendant **MEMBER SOURCE MEDIA,**

16  **LLC**, (hereinafter **"MSM"**) which maintains offices at 1322 Maple Street, San Mateo,

17  California, according to representations made to the Secretary of State of California.   The

18  Secretary of State of California also lists an agent for service for **MEMBER SOURCE MEDIA,**

19  **LLC,** in California.   The other **dba's** named in this suit are copyrighted brand names owned by

20  **MEMBER SOURCE MEDIA, LLC.**    (See **Exhibit "A"** California Secretary of State Business

21  Portal Report, and **Exhibit "B"** Terms and Conditions from each of the websites for the Brand

22  Names stating that they are owned by **MEMBER SOURCE MEDIA, LLC**).    Therefore, the

23  court has personal jurisdiction pursuant to physical presence of the Defendant within the

24  court's territorial jurisdiction. **Burnham v. Sup.Ct.**, 495 US at 610–611, (1990).

25  3.    Venue is proper in this Court pursuant to **28 USC  §1391(b)** and is founded on

26  the fact that a substantial part of the unlawful actions of the defendants occurred in this judicial

27  district, that is the emails were sent to an Email and Internet Access Provider in Garberville,

28  California.

FIRST AMENDED COMPLAINT                                  2                                  C-08-1321 EMC

**FACTUAL ALLEGATIONS**

4.     Plaintiff is informed and believes and therefore alleges that Defendant **MSM** is a California Limited Liability Company.  (see **Exhibit "A"**)  Defendant **MSM** is believed to be a limited liability company or the agent of a limited liability company or partnership providing internet marketing services to retailers selling to residents of the United States and California over the internet.

5.     Plaintiff is informed and believes and therefore alleges that Defendants **PREMIUM PERKS (aka PREMIUMPERKS.COM), also dba ONLINE REWARD GROUP (aka ONLINEREWARDGROUP.COM), also dba FREE RETAIL REWARDS (aka FREERETAILREWARDS.COM), also dba GREAT AMERICAN GIVEAWAYS (aka GREATAMERICANGIVEAWAYS.COM), also dba CONSUMER GAIN (aka CONSUMERGAIN.COM),** are aliases or agents for Defendants **MSM, LLC.**  (See **Exhibit "B"** – Terms and Conditions from various web sites stating the relationship between the parties).

6.     Plaintiff **ASIS INTERNET SERVICES (hereafter  "ASIS")** does not know the true names and capacities of Defendants **MSM and DOES ONE to FIFTY, inclusive**, their business capacities, their ownership connection to the business(s), nor their relative responsibilities in causing the *CAN-SPAM Act of 2003* and other violations herein complained of, and alleges, on information and belief, a joint venture and common enterprise by all such defendants.  Plaintiff is informed and believes that each of the defendants herein, including DOES ONE to FIFTY, inclusive, is the agent, ostensible agent, master, servant, employer, employee, representative, franchiser, franchisee, joint venturer, partner, and associate, or such similar capacity, of each of the other defendants, and was at all times acting and performing, or failing to act or perform, with the authorization, consent, permission or ratification of each of the other defendants, and is responsible in some manner for the acts and omissions of the other defendants in legally causing the violations and damages complained of herein, and have approved or ratified each of the acts or omissions of each other defendant, as herein described.  Plaintiff will seek leave to amend this Complaint when the true names, capacities, connections and responsibilities of defendants **MSM and DOES ONE to FIFTY, inclusive**, are

1    ascertained.

2        7.    Plaintiff is informed and believes and therefore alleges that all named

3    defendants, including **DOES ONE to FIFTY, inclusive**, conspired to commit the acts

4    described herein, or alternatively, aided and abetted one another in the performance of the

5    wrongful acts hereinafter alleged.

6        8.    Plaintiff **ASIS** is a California corporation registered to do business in California

7    and is located in Garberville, California.   **ASIS** provides Internet access service within the

8    meaning of **15** *USC* **§7702(11)** and email service within the meaning of *California Business &*

9    *Professions Code* **§**17529.5.

10       9.    Plaintiff alleges that Defendants sent or caused to have sent **5564** commercial

11   electronic mail messages from **March 3, 2006, through May 5, 2008**, to Plaintiff **ASIS'**

12   servers, protected computers, containing, and/or accompanied by, header information that was

13   materially false or materially misleading.

14       10.   Plaintiff received Defendant's emails and Plaintiff has suffered adverse affect

15   from the sending and receipt of Defendant's emails.   Plaintiff states that it was adversely

16   affected by having to process the emails over their servers and by having their agents

17   investigate the offending emails.   Plaintiff's web site has a clear notice that misuse of its

18   resources is prohibited:

19           "ASIS provides the use of its equipment and services for the
             exclusive use of its subscribing customers. ASIS prohibits the use
20           of its equipment and services by anyone other than its subscribing
             customers for any purpose unless specifically authorized by ASIS
21           in writing. ASIS specifically prohibits the use of its equipment and
             services, including but not limited to mail servers, for delivery,
22           transmission, or re-transmission of unsolicited commercial emails
             (UCE) or unsolicited bulk emails (UBE)."
23

24   See **ASIS' Acceptable Use Policy** at www.asis.com.

25       11.   Plaintiff ASIS was adversely affected by Defendant's emails in the following

26   manner:

27           a. ASIS received the emails at issue in this suit, processed those emails through

28               its SPAM filtering service Postini; processed the emails through its email

server; preserved the emails on its servers, and transferred the emails to its attorneys as evidence in this case.  See Declaration of Nella White, President of ASIS, (hereafter "Dec of NW") ¶2.

b.  ASIS estimates that a third of its' employees' time is spent on customer spam complaints and technical issues, such as modifications to individual customer account filtering to reduce SPAM and avoid false positives.  ASIS spends a considerable amount of time in sender authentication, a process where ASIS stops its users or users who have been taken over as zombies, from sending SPAM to other sites.  This is an industry wide problem as any ISP that is discovered allowing their customers to send SPAM will be blocked by the other ISPs.  As the level of SPAM has increased since 2005 the sender authentication process has become increasingly burdensome to avoid email blockage by the network.  Dec of NW ¶3.

c.  ASIS estimates that the prevention of SPAM costs about $3000 per month in SPAM filtering costs and employee time.  Dec of NW ¶4.

d.  In 2005 ASIS increased its computer server capacity and network capacity as a result of the spam emails it has received in the last several years and collocated its servers with Falcon Knight hosting and administration services.  As part of its contract with Falcon Knight, ASIS has contracted for on demand bandwidth increases to cover network spikes caused by SPAM.  ASIS has not exceeded its on demand limits and has not had to pay excess fees beyond the fixed costs of the contract since 2005.  In 2007, ASIS changed its email server from SENDMAIL to Postfix to upgrade its services to process and capture SPAM email that was evading the Postini filtering service and going directly to customers.  Dec of NW ¶5.

e.  ASIS incurs network and processor slow downs occasionally as a result of constantly increasing SPAM loads.  Dec of NW ¶6.

f.  ASIS has not incurred any server or network crashes directly attributable to

1    SPAM in the last three years.  Dec of NW ¶7.

2    12.    Plaintiff alleges that Defendants sent or caused to have sent **5564** commercial

3    electronic mail messages from **March 3, 2006, through MAY 5, 2008**, to Plaintiff **ASIS'**

4    servers with a subject line that a person would know would be likely to mislead a recipient,

5    acting reasonably under the circumstances, about a material fact regarding the contents and

6    subject matter of the message.

7    13.    Plaintiff states that the email accounts that the **5564** commercial emails sent to

8    **ASIS** accounts did not solicit the emails.  These emails were unsolicited because they were

9    sent to unassigned or inactive email accounts owned by **ASIS**.  **ASIS** did not solicit any

10   product, service, or information from any entity using these email accounts.

11   14.    Plaintiff **ASIS** alleges that Defendants sent or caused to have sent **5564**

12   unsolicited e-mail advertisements containing and/or accompanied by falsified, misrepresented,

13   or forged header information.

14   15.    Plaintiff **ASIS** alleges that Defendants sent or caused to have sent **5564**

15   unsolicited e-mail advertisements containing and/or accompanied by misleading subject lines.

16   16.    Plaintiff alleges that Defendants used a harvest and directory attack to acquire

17   Plaintiff's and Plaintiff's customers email accounts to send **5564** commercial electronic mail

18   messages to Plaintiff's protected computers.  Many of the email accounts receiving the emails

19   have not been active for several years.

20   17.    Plaintiff alleges that Defendants used an automated creation of multiple email

21   accounts to send **5564** commercial electronic mail messages to Plaintiff's protected

22   computers.

23                                      **FIRST CAUSE OF ACTION**
       (**Violation of CAN-SPAM Act of 2003 – 15 *U.S.C.* §7704(a)(1) and (2),**
24                            **and 15 *U.S.C.* §7704(b)(1) and (2))**

25   18.    Plaintiff refers to the allegations of the preceding paragraphs of this complaint,

26   and incorporates the same herein by this reference as though set forth in full.

27   19.    On **March 3, 2006, through May 5, 2008**, Plaintiff **ASIS** received **5564**

28   commercial electronic mail messages from defendants to its mail server located in California

1  that violated the **CAN-SPAM Act of 2003**.

2      20.    Plaintiff alleges that all of the relevant electronic mails sent by or on behalf of the

3  Defendants on **March 3, 2006, through May 5, 2008**, contained or were accompanied by

4  header information that was materially false or materially misleading.   Each of these **5564**

5  messages indicated that they were from email accounts from domain names such as

6  greenthe.com, consumerbargrewards.com, and innocenttruthrevealed.com.  See **Exhibit "C"**

7  for a complete list of the sending domain names at issue in this action.  See sample emails

8  and source codes in **Exhibit "D"** attached hereto.  (Note that all receiving email accounts have

9  been redacted, while these email all represent inactive email accounts they are still the

10  property of **ASIS** and are protected by Plaintiff's corporate privileges.)  A WHOIS check of the

11  domain name registration for the sender of all of the emails indicates that the domain names

12  were registered using a privacy or proxy service. See **Exhibit "E."**  The true registrant for the

13  sender of all of the emails cannot be determined without a subpoena.  Plaintiff has reviewed

14  the Domain Name registration for all of the sending Domain Names and determined that all of

15  the emails were sent using email accounts registered to domain names that are registered

16  under services that conceal the true identity of the domain name registrant through a proxy

17  service or privacy service.   Also see the domain name privacy/proxy service registration

18  agreements in **Exhibit "F."**

19      **15 _U.S.C._ §7704(a)(1)(A)** states:

20          "(A) header information that is technically accurate but includes an
21          originating electronic mail address, domain name, or Internet
             Protocol address the access to which for purposes of initiating the
22          message was obtained by means of false or fraudulent pretenses
             or representations shall be considered materially misleading."

23      **15 _U.S.C._ §7704(a)(6)** states:

24          "the term "materially" when used with respect to false or misleading
             header information, includes the alteration or concealment of
25          header information in a manner that would impair the ability of an
             Internet access service processing the message on behalf of a
26          recipient, a person alleging a violation of this section, or a law
             enforcement agency to identify, locate, or respond to a person who
27          initiated the electronic mail message or to investigate the alleged
             violation…"
28

The registration agreements for the proxy/privacy services prohibit the use of domain names registered in this manner to send bulk commercial emails.  Therefore, since false information was used to generate the domain names and/or domain names were concealed from investigation through proxy/privacy services the electronic mail messages violated **15 *U.S.C.* §7704(a)(1)(A)**.

21.    Further an investigation of the IP addresses used to send the emails, indicate that at least **1856** of the emails were sent from IP addresses that were obtained through false representations.  These emails were sent from a mail servers residing on network IP address block 72.46.135.128 - 72.46.135.159.  Registration for this block of IP addresses is to R & D Technologies, LLC, of Las Vegas, Nevada.  R&D Technologies is a well known hosting site selling computer services.  This block of IP addresses was sub-leased to Frank Peters, 636 NW 39th Ave, Deerfield Beach, Florida, 33442.  See **Exhibit "G"** consisting of WHOIS reports for the IP address.  Plaintiff's investigations indicate that there is no Frank Peters at this address and that the property belongs to "Richard J. Rausch" aka RJR Consulting, Inc.  See **Exhibit "H,"** Florida Secretary of State Report Corporation Report.  Therefore these emails contain IP addresses obtained with false representations and are in violation of **15 *USC* §7704(a)(1)(A)**.

22.    Plaintiff further alleges that the Defendants sent or had sent **5564** separate items of electronic mail to Plaintiff's computers that include advertisements with a subject line that a person would know would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents and subject matter of the message. **15 *U.S.C.* §7704(a)(2)(1)** defines two methods for determining if a subject line is misleading: "1) if such person has actual knowledge," or 2) "knowledge fairly implied on the basis of objective circumstances."  Plaintiff alleges that the "circumstances" required are plainly visible in the actual subject lines of the emails. Defendants advertise and market their offers through email and Web-based ads. **5564** of the emails received by Plaintiff contain statements such as "WAL*MART(R) 500 Dollar Gift Card Inside," "Second Attempt: $500 Target Gift Card Inside," "Get Babies Clothes on us, when participating in our program," and "Second Attempt:

Victoria's Secret (R) Gift Card Inside" in the subject lines.  See **Exhibit "I"** for a complete list of the email subject lines.  No gift card was contained in the email, only an advertisement and links to Defendant's web sites.  The email subject lines received by Plaintiff were clearly intended to get someone to open the email by enticing them with free gifts.  See **Exhibit "D"** for sample emails.  (Note that all receiving email accounts have been redacted, while these email all represent inactive email accounts they are still the property of **ASIS** and are protected by corporate privilege.)

      23.  **15 USC §7704(a)(2)** states that a violation is proper if consistent with **15 USC §45**.  **15 USC §45** is titled "Unfair methods of competition unlawful; prevention by Commission," and enables the Federal Trade Commission to issue orders regarding unfair trade practices.  **15 USC §45(d)** provides that the orders of the Commission are exclusive unless overturned by the United States Court of Appeals.   The FTC has issued 16 **CFR** part 251, "Guide concerning use of the word 'free' and similar representations."   16 **CFR** Part 251 states that the terms of the offer should be set out clearly and conspicuously at the outset of the offer so that no misunderstanding can occur. Most of the emails subject lines represent that the recipient has received a free gift.  For example the email with the subject line "Second Attempt: Macy's 500 Dollar Gift Card Inside" further states in the body of the email "You have been chosen to receive a FREE $500 Macy's Gift Card."  The web sites that the email recipient is directed to contain extensive terms and conditions that require the recipient to provide personal information and their agreement to take several "sponsor offers."   See **Exhibit "B"** for the Terms and Conditions, see **Exhibit "J"** for printouts of the Defendant's website for the "Macy's 500 Dollar Gift Card."  Only by going to Defendant's web sites can the recipient find out what the terms and conditions are for the supposedly free gifts.  This evidence indicates and Plaintiff alleges that the subject lines and advertisements contained in the emails are in violation of 16 **CFR** Part 251 and therefore also in violation of **15 USC §7704(a)(2).**

      24.  Plaintiff further alleges that the Defendants sent **5564** separate items of electronic mail to plaintiff's computer that include statements in the body of the emails stating that they are email messages from **PREMIUM PERKS (aka PREMIUMPERKS.COM), also**

dba **ONLINE REWARD GROUP (aka ONLINEREWARDGROUP.COM), also dba FREE RETAIL REWARDS (aka FREERETAILREWARDS.COM), also dba GREAT AMERICAN GIVEAWAYS (aka GREATAMERICANGIVEAWAYS.COM), also dba CONSUMER GAIN (aka CONSUMERGAIN.COM)**.  Uniform Resource Locators (hereafter URLs) contained in the emails directed the recipient to websites of **PREMIUM PERKS (aka PREMIUMPERKS.COM), also dba ONLINE REWARD GROUP (aka ONLINEREWARDGROUP.COM), also dba FREE RETAIL REWARDS (aka FREERETAILREWARDS.COM), also dba GREAT AMERICAN GIVEAWAYS (aka GREATAMERICANGIVEAWAYS.COM), also dba CONSUMER GAIN (aka CONSUMERGAIN.COM)**.  Plaintiff alleges that these entities, trademarks, and websites are owned by **MSM**.

25.    Plaintiff further alleges that they received **5564** of separate items of electronic mail from the Defendants to email addresses that had not existed for the prior year and had not requested or agreed to accept any solicitations.

26.    Plaintiff further alleges that the Defendants sent or had sent **5564** separate items of electronic mail to Plaintiff's computers that were acquired as the result of a directory harvest.  Said conduct was in violation of **15 *USC* §7704(b)(1)**.

27.    Plaintiff further alleges that the defendants sent or had sent **5564** separate items of electronic mail to plaintiff from addresses that were acquired by the use of automated tools or scripts.  Said conduct was in violation of **15 *USC* §7704(b)(2)**.

28.    As a proximate result of said unlawful conduct by said Defendants, Plaintiff is entitled to statutory damages in the amount of up to $100.00 per email in the case of violation of **15 *USC* §7704(a)(1)** and up to $25.00 per email in the case of each violation of subsections **15 *USC* §7704(a)(2)** in the form of statutory damages as set forth in **15 *USC* §7706(g)(1)(B)(ii) and (3)(A)(i)** and **(ii)**.

29.    As a proximate result of said unlawful conduct by said defendants, Plaintiff is entitled to treble all statutory damages as a result of violation of any section of **15 *USC* §7704(b)** as set forth in **15 *USC* §7706(g)(1)(C)**.

30.    Plaintiff furthermore seeks a preliminary and permanent injunction against the

defendants for its current and future violations of the ***CAN-SPAM Act of 2003*** as Plaintiff and members of the general public will continue to incur damages as a result of the unlawful conduct of said defendants.   The seeking of injunctive relief by plaintiff is specifically authorized by **15 *USC* §7706(g)(1)(A)**.

31.    Plaintiff furthermore seeks its attorney fees and costs against the defendants pursuant to **15 *USC* §7706(g)(4)**.

**SECOND CAUSE OF ACTION**

**(Violation of *California Business and Professions Code* §17529.5
Unlawful activities relating to commercial email advertisements.)**

32.    Plaintiff hereby incorporates by reference the preceding paragraphs, inclusive, as if the same were fully set forth herein.

33.    Plaintiff alleges that all of the relevant electronic mail advertisements sent by or on behalf of the Defendants on **March 3, 2006, through May 5, 2008**, contained or were accompanied by header information that was materially false or materially misleading.  Each of these **5564**  messages indicated that they were from email accounts from domain names such as greenthe.com, consumerbargrewards.com, and innocenttruthrevealed.com.   See **Exhibit "C"** for a complete list of the domain names at issue in this action.   See sample emails and source codes in **Exhibit "D"** attached hereto.  (Note that all receiving email accounts have been redacted, while these email all represent inactive email accounts they are still the property of **ASIS** and are protected by Plaintiff's corporate privileges.)  A WHOIS check of the domain name registration for the sender of all of the emails indicates that the domain names were registered using a privacy or proxy service. See **Exhibit "E."**  The true registrant for the sender of all of the emails cannot be determined without a subpoena.  Plaintiff has reviewed the Domain Name registration for all of the sending Domain Names and determined that all of the emails were sent using email accounts registered to domain names that are registered under services that conceal the true identity of the domain name registrant through a proxy service or privacy service.

34.    Further an investigation of the IP addresses used to send the emails, indicate that at least **1856** of the emails were sent from IP addresses that were obtained through false

representations.  These emails were sent from a mail servers residing on network IP address block 72.46.135.128 - 72.46.135.159.  Registration for this block of IP addresses is to R & D Technologies, LLC, of Las Vegas, Nevada.  R&D Technologies is a well known hosting site selling computer services.  This block of IP addresses was sub-leased to Frank Peters, 636 NW 39th Ave, Deerfield Beach, Florida, 33442.  See **Exhibit "G"** consisting of WHOIS reports for the IP address.  Plaintiff's investigations indicate that there is no Frank Peters at this address and that the property belongs to "Richard J. Rausch" aka RJR Consulting, Inc.  See **Exhibit "H,"** Florida Secretary of State Report Corporation Report.

35.    Therefore, the electronic mail advertisements violated ***California Business and Professions Code*** **§17529.5(a)(2)**.

36.    Plaintiff further alleges that the Defendants sent **5564** separate unsolicited electronic mail advertisements to plaintiff's computers that include various subject lines that were false and misleading and would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message in violation of ***California Business and Professions Code*** **§17529.5(a)(3)**.  Plaintiff alleges that the "circumstances" required are plainly visible in the actual subject lines of the emails.  The email subject lines received by Plaintiff were clearly intended to get someone to open the email by enticing them with free gifts such as: "WAL*MART(R) 500 Dollar Gift Card Inside," "Second Attempt: $500 Target Gift Card Inside," "Get Babies Clothes on us, when participating in our program," and "Second Attempt: Victoria's Secret (R) Gift Card Inside" in the subject lines.  See **Exhibit "I"** for a complete list of the email subject lines.  No gift card was contained in the email, only an advertisement and a link Defendant's web sites.  The email subject lines received by Plaintiff were clearly intended to get someone to open the email by enticing them with free gifts.  See **Exhibit "D"**  for sample emails.  (Note that all receiving email accounts have been redacted, while these email all represent inactive email accounts they are still the property of **ASIS** and are protected by corporate privilege.)

37.    As a proximate result of said unlawful conduct by said Defendants, Plaintiff is entitled to liquidated damages in the amount of $1,000.00 for each unsolicited commercial

1  email transmitted in violation of *California Business and Professions Code* §17529.5(a) as

2  set forth in *California Business and Professions Code §*17529.5(b)(1)(B)(ii).

3        38.    Plaintiff furthermore seeks its attorney fees and costs against the defendants

4  pursuant to *California Business and Professions Code* §17529.5(b)(1)(C).

5        **WHEREFORE**, plaintiff prays judgment against the defendants and each of them as

6  follows:

7        1.    For statutory damages of up to $100.00 for each violation of **15 *USC* §7704(a)(1)**

8  and up to $25.00 in the case of violations of **§7704(a)(2)** in the sum of **$695,500**;

9        2.    For aggravated damages under **15 *USC* §7706(g)(1)(C)** of up to three times the

10 amount above for these violations committed by the defendants' violations of **15 *USC* §7704(b)**

11 in the sum of **$2,086,500**;

12       3.    For a preliminary and permanent injunction preventing the defendants and all

13 persons acting in concert with them from the violation of the ***Can-Spam Act of 2003***;

14       4.    For liquidated damages of $1000.00 for each violation of ***California Business***

15 ***and Professions Code* §17529.5(a)** in the sum of **$5,564,000**;

16       5.    For an award of reasonable attorneys' fees and costs according to proof;

17       6.    For costs of suit; and

18       7.    For such other and further relief as this Courts deems just and proper.

19                               **SINGLETON LAW GROUP**

20

21 Dated:      July 16, 2008        /s/ Jason K. Singleton

22                                 Jason K. Singleton
Richard E. Grabowski, Attorneys for Plaintiff,

23                                 **ASIS INTERNET SERVICES**

24 *///*

25 *///*

26 *///*

27 *///*

28 *///*

**REQUEST FOR JURY TRIAL**

Plaintiff hereby requests a jury for all claims for which a jury is permitted.

**SINGLETON LAW GROUP**

Dated:        July 16, 2008             /s/ Jason K. Singleton
                                        Jason K. Singleton
                                        Richard E. Grabowski, Attorneys for Plaintiff,
                                        **ASIS INTERNET SERVICES**

**Jason K. Singleton,** State Bar #166170
jason@singletonlawgroup.com
**Richard E. Grabowski,** State Bar #236207
rgrabowski@mckinleyville.net
**SINGLETON LAW GROUP**
**611 "L" Street, Suite A**
**Eureka, CA 95501**

**(707) 441-1177**
**FAX  441-1533**

**Attorneys for Plaintiff, ASIS INTERNET SERVICES**

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASIS INTERNET SERVICES, a California corporation**<br><br>        **Plaintiff,**<br>**vs.**<br><br>**MEMBER SOURCE MEDIA, LLC, a California limited liability company, et al.,**<br><br>        **Defendants.** | **Case No.  CV-08-1321 EMC**<br><br>**DECLARATION OF NELLA WHITE IN SUPPORT OF FIRST AMENDED COMPLAINT** |

I, NELLA WHITE, declare as follows:

1.      I am the President and CEO of Plaintiff, ASIS INTERNET SERVICES.  I have personal and firsthand knowledge of each fact hereinafter set forth and if called to testify could and would competently testify to the matters set forth herein.

2.      ASIS received the emails at issue in this suit, processed those emails through its .SPAM filtering service Postini; processed the emails through its email server; preserved the emails on its servers, and transferred the emails to its attorneys as evidence in this case.

3,      ASIS estimates that a third of its' employees' time is spent on customer spam complaints and technical issues, such as modifications to individual customer account filtering to reduce SPAM and avoid false positives.  ASIS spends a considerable amount of time in sender authentication, a process where ASIS stops its users or users who have been taken over as zombies, from sending SPAM to other sites.  This is an industry wide problem

1  as any ISP that is discovered allowing their customers to send SPAM will be blocked by the

2  other ISPs.   As the level of SPAM has increased since 2005 the sender authentication

3  process has become increasingly burdensome to avoid email blockage by the network.

4       4.      ASIS estimates that the prevention of SPAM costs about $3000 per month in

5  SPAM filtering costs and employee time.

6       5.      In 2005 ASIS increased its computer server capacity and network capacity as a

7  result of the spam emails it has received in the last several years and collocated its servers

8  with Falcon Knight hosting and administration services.   As part of its contract with Falcon

9  Knight, ASIS has contracted for on demand bandwidth increases to cover network spikes

10 caused by SPAM.   ASIS has not exceeded its on demand limits and has not had to pay

11 excess fees beyond the fixed costs of the contract since 2005.   In 2007, ASIS changed its

12 email server from SENDMAIL to Postfix to upgrade its services to process and capture SPAM

13 email that was evading the Postini filtering service and going directly to customers.

14      6.      ASIS incurs network and processor slow downs occasionally as a result of

15 constantly increasing SPAM loads.

16      7.      ASIS has not incurred any server or network crashes directly attributable to

17 SPAM in the last three years.

18      I declare under penalty of perjury under the laws of the United States of America that

19 the foregoing is true and correct

20

21 Dated:        July __, 2008                    _____

22                                                NELLA WHITE, President
                                                **ASIS INTERNET SERVICES**

23

24

25

26

27

28