**Jason K. Singleton,** State Bar #166170
jason@singletonlawgroup.com
**Richard E. Grabowski,** State Bar #236207
rgrabowski@mckinleyville.net
**SINGLETON LAW GROUP**
**611 "L" Street, Suite A**
**Eureka, CA 95501**

**(707) 441-1177**
**FAX  441-1533**

Attorneys for Plaintiff, ASIS INTERNET SERVICES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIS INTERNET SERVICES, a California corporation | ) Case No.  CV-08-1321 EMC |
| | ) |
| Plaintiff, | ) **APPENDIX OF RECENT AUTHORITY IN** |
| vs. | ) **SUPPORT OF PLAINTIFF'S BRIEF** |
| | ) **REGARDING ITS STATE CLAIMS** |
| | ) **UNDER CALIFORNIA BUSINESS AND** |
| MEMBER SOURCE MEDIA, LLC, a California | ) **PROFESSIONS CODE §17529.5** |
| limited liability company, et al., | ) |
| | ) |
| Defendants. | ) |

Plaintiff, ASIS INTERNET SERVICES, respectfully submits the following Appendix of Recent Authority in support of its Brief Regarding Its State Claims Under *California Business And Professions Code* §17529.5.

EXHIBIT A:  ***Asis Internet Services, et al., vs. Subscriberbase, Inc.***, USDC, Northern District of California, Case No. C-09-3503 SC, Docket No. 24, <u>Order Denying Defendants' Motion to Dismiss</u>, dated April 1, 2010.

### SINGLETON LAW GROUP

Dated:      April 1, 2010

 /s/ Jason K. Singleton                            
Jason K. Singleton
Richard E. Grabowski, Attorneys for Plaintiff,
**ASIS INTERNET SERVICES**

United States District Court
For the Northern District of California

1

2

3

4          IN THE UNITED STATES DISTRICT COURT

5          FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7   ASIS INTERNET SERVICES, a          )  Case No. 09-3503 SC
    California corporation, and JOEL    )
8   HOUSEHOLTER, dba KNEELAND           )  ORDER DENYING DEFENDANTS'
    ENGINEERING, dba FOGGY.NET,         )  MOTION TO DISMISS
9                                       )
                                        )
10          Plaintiffs,                 )
                                        )
11      v.                              )
                                        )
12  SUBSCRIBERBASE INC., et al.,        )
                                        )
13          Defendants.                 )
                                        )
14  _____ )

15  I.   **INTRODUCTION**

16      Plaintiffs Asis Internet Services ("Asis") and Joel

17  Householter, dba Foggy.Net ("Foggy") (collectively, "Plaintiffs"),

18  brought this suit against Defendants Subscriberbase, Inc., et al.

19  ("Defendants"), for alleged violations of section 17529.5 of the

20  California Business & Professions Code.[1]  Docket No. 1 ("Compl.").

21  This Court granted Defendants' previous motion to dismiss for

22  failure to state a claim, and described the information that

23  Plaintiffs needed to include in order to plead their deceit-based

24  claims with particularity.  Docket No. 15 ("Dec. 4, 2009 Order").

25  Plaintiffs filed a First Amended Complaint that comported with the

26  Court's guidance.  Docket No. 17 ("FAC").  Now Defendants have

27  _____

28  [1] Throughout this Order, all citations to "sections" are to the
    California Business & Professions Code unless otherwise stated.

filed a second Motion to Dismiss ("Motion"), on substantially identical grounds to their previous motion. Docket No. 20. The Motion is fully briefed. Docket Nos. 22 ("Opp'n"), 23 ("Reply"). For the reasons stated below, the Court DENIES the Motion.

## II. DISCUSSION

Plaintiffs seek to hold Defendants liable for violations of section 17529.5 of the California Business & Professions Code ("section 17529.5"), which is part of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 <u>et</u> <u>seq.</u> The parties are familiar with the factual background of this dispute, as well as the legal standards applicable to Defendants' Motion to Dismiss, which this Court set out in its previous Order. Dec. 4, 2009 Order at 2-5. Although Plaintiffs have provided more detail in their FAC, the allegations remain substantially the same as in their original Complaint.

### A. **Whether Plaintiffs Have Pled that Email Subject Lines Were False, or Known to Be Likely to Mislead a Recipient Acting Reasonably Under the Circumstances**

The first question before the Court is whether Plaintiffs have sufficiently alleged that Defendants sent e-mail advertisements with "subject line[s] that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message." Cal. Bus. & Prof. Code § 17529.5(a)(3). Plaintiff is alleging that the subject lines purport to offer the recipient "free" gifts, or some clever synonym for the same, while in fact the emails and associated web pages offer gifts only to those who perform additional affirmative acts, such as signing up for credit

2

1   cards or submitting loan applications.  Dec. 4, 2009 Order at 10;

2   FAC ¶ 20.

3                  1.   <u>Whether a Recipient Would Likely Be Deceived</u>

4            In the submissions related to the first motion to dismiss, the

5   parties only briefly touched upon the question of whether the

6   subject lines in Defendants' emails would be likely to deceive a

7   reasonable recipient.  Defendants have made this question a focus

8   of their current Motion.  Mot. at 6-10.  Defendants claim that this

9   is a question of law to be undertaken by the Court at the dismissal

10  stage.  <u>Id.</u> at 7.  For support, Defendants mistakenly cite to <u>Lavie</u>

11  <u>v. Procter & Gamble Co.</u>, which stated that "[t]he standard to be

12  used in evaluating whether an advertisement is deceptive under the

13  UCL is purely a question of law and certainly has important public

14  policy implications for California consumers and businesses."  105

15  Cal. App. 4th 496, 503 (Ct. App. 2003).

16           The Court disagrees with Defendants' reading of <u>Lavie</u>.  <u>Lavie</u>

17  did not suggest that the question of whether an ad was deceptive

18  was a question of law; it held that the question <u>of which standard</u>

19  <u>to use</u> in making that determination was a question of law.  The

20  appellate panel in <u>Lavie</u> was discussing whether it could consider a

21  new issue that was raised for the first time on appeal, in an

22  amicus brief submitted by the California Attorney General.  <u>Id.</u> at

23  503.  It concluded that it could do so as long as "the issue posed

24  is purely a question of law based on undisputed facts . . . ."  <u>Id.</u>

25  (quoting <u>Fisher v. City of Berkeley</u>, 37 Cal. 3d 644, 654-55 n.3

26  (1984)).  The particular issue that the Attorney General raised had

27  to do with whether the trial court should have used a "least

28  sophisticated consumer" standard rather than a "reasonable

<b>United States District Court</b>
For the Northern District of California

United States District Court
For the Northern District of California

1   consumer" standard to determine whether the advertisements were

2   likely to mislead or deceive the public.  Id. at 502.  In other

3   words, the issue was not whether a reasonable person would be

4   deceived by the advertisements in question, but rather which

5   standard of "reasonable" the court should use to resolve that

6   question.  That was clearly a question of law.

7       In contrast, the question here is whether a reasonable

8   consumer[2] is likely to be deceived by Defendants' subject headings.

9   This is clearly a question of fact, which is best left for a jury,

10  unless "[n]o reasonable trier of fact could conclude otherwise."

11  Colgan v. Leatherman Tool Group, Inc., 135 Cal. App. 4th 663, 682

12  (Ct. App. 2006).  Various California authorities maintain that

13  whether a reasonable consumer would be deceived by a particular ad

14  or practice is a question of fact.  For example, in Consumer

15  Advocates v. Echostar Satellite Corp., a California appellate court

16  found "a triable issue of fact on the relevant point, whether . . .

17  representations are likely to deceive a reasonable consumer."  113

18  Cal. App. 4th 1351, 1361-62 (Ct. App. 2003); see also Mazza v. Am.

19  Honda Motor Co., 254 F.R.D. 610, 627 (C.D. Cal. 2008) (question of

20

21  [2] Defendants contend that this Court should not use a general
    reasonable consumer standard to weigh the likelihood of deception,

22  but rather a special (presumably more rigorous) standard to apply
    to "internet users."  Mot. at 7.  Defendants again cite Lavie for

23  this proposition.  However, Lavie didn't say that a more rigorous
    standard should apply where advertisements might target a

24  sophisticated group; rather, it held that "unless the advertisement
    targets a particular disadvantaged or vulnerable group, it is

25  judged by the effect it would have on a reasonable consumer."  105
    Cal. App. 4th at 506-07.  The FAC does not suggest that Defendants

26  were targeting any particular group.  "Internet users" and email
    are now too ubiquitous to make this a useful class, as

27  distinguishable from general consumers.  Of course, the ultimate
    fact finder will eventually need to consider whether a recipient

28  would be likely to be misled if "acting reasonably under the
    circumstances . . . ."  Cal. Bus. & Prof. Code § 17529.5(a)(3).

4

whether omission would be likely to deceive reasonable consumer was "common issue of fact" among class).  Similarly, the question of whether particular practices are likely to deceive members of the public is generally treated as a question of fact when it arises under California's related Unfair Competition Law ("UCL"), Cal. Prof. & Bus. Code §§ 17200 et seq.  See, e.g., People v. McKale, 25 Cal. 3d 626, 635 (1980) (allegations that customers "are likely to be deceived" by particular practice "are sufficient to withstand demurrer").  California Courts have therefore found that "[w]hether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides and which usually cannot be made on demurrer." Linear Tech. Corp. v. Applied Materials, Inc., 152 Cal. App. 4th 115, 134 (Ct. App. 2007) (citation and internal quotation marks omitted).

Defendants therefore have the relatively heavy burden of persuading this Court that no reasonable fact finder could conclude that the email subject lines were "likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message."  Cal. Bus. & Prof. Code § 17529.5(a)(3); Colgan, 135 Cal. App. 4th at 682.  Defendants rely on Freeman v. The Time, Inc., Magazine Co., but this case is distinguishable.  68 F.3d 285 (9th Cir. 1995).  In Freeman, the Ninth Circuit affirmed the dismissal of an FAL claim that involved an offer to enter a sweepstakes, where the offer included language that indicated that the recipient had already won a prize.  Id. at 289.  Because the terms of the offer were adjacent to the offer itself, the Ninth Circuit held that dismissal was

appropriate because no reasonable recipient could have been

deceived into thinking that he or she had won the sweepstakes.  Id.

As the panel explained:

> The promotions expressly and repeatedly state the
> conditions which must be met in order to win.
> None of the qualifying language is hidden or
> unreadably small.   The qualifying language
> appears immediately next to the representations
> it qualifies and no reasonable reader could
> ignore it.   Any persons who thought that they had
> won the sweepstakes would be put on notice that
> this was not guaranteed simply by doing
> sufficient reading to comply with the
> instructions for entering the sweepstakes.

Id. at 289-90.

Defendants also rely on Haskell v. Time, Inc., which is also

inapposite.  857 F. Supp. 1392 (E.D. Cal. 1994).  Haskell addressed

similar mass mailings that involved sweepstakes and used puffed

language to entice responses.  Id. at 1399-403.  That decision

noted that "[a]ny reasonable recipient, even if unsophisticated,

understands that these are mass mailings as part of an advertising

campaign.  The rules are set forth clearly, in a box headed 'How

the Sweepstakes Works,' and reveal the projected odds of winning

any prize."  Id. at 1399-400.  The Court noted the plaintiff's

attempt to distort the content of the mailers to support his claim:

> The complaint alleges that the solicitation
> states that the recipient "has just won Ten
> Million Dollars!"   In fact, the exemplar states,
> "If the Address Label below contains the winning
> number and you return it . . . . you'll see on
> NBC TV that you've just won ten million dollars!"
> No reasonable recipient could view this mass
> mailing as an announcement that the recipient in
> fact had been selected as the winner.

Id. at 1400-01.[3]

_____

[3] The mailers in Freeman involved language that was similar to that
in Haskell, with similar qualifiers immediately adjacent to any

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Turning to the email subject lines cited by Plaintiffs in their FAC, the Court finds that these do not present the clear case presented by <u>Freeman</u> and <u>Haskell</u>.  Unlike the express conditions juxtaposed with every assurance in those cases (e.g., "If the Address Label below contains the winning number . . ."), many of the subject headings in Defendants' emails include no conditional language.  <u>See</u>, <u>e.g.</u>, FAC Ex. J ("List of Emails Received by Asis") at 5 (e.g., "Get the latest BlackBerry Storm phones on our tab!").  Many of these offers are couched as offers to employ the recipient as some type of consumer reviewer.  For example:

- "Take a 15 second online survey to get $500 bucks from our sponsor to shop at Dollar General & more for Free"

- "Review & Keep Designer Handbags worth $1500 Dollars-guys invited too"

- "Test & Keep a BlackBerry Storm (Paid by Sponsors)"

- "How would you like to be chosen to test and keep a Hi Definition TV?"

- "Mystery Shoppers-Rate Local Retail Stores - Shop and Keep $1000 Worth-Limited Applicants Needed"

<u>Id.</u> at 2, 13, 16, 19.

The Court finds that the above-quoted language is less cautious than the representations made in the sweepstakes mailers at issue in <u>Freeman</u> and <u>Haskell</u>.  In particular, this Court notes that the Court in <u>Haskell</u> explicitly rebuked the plaintiff for attempting to recast the clearly qualified language in the mailers

---

apparent assurance of winning.  68 F.3d at 287 ("If you return the grand prize winning number, we'll officially announce that MICHAEL FREEMAN HAS WON $1,666,675.00 AND PAYMENT IS SCHEDULED TO BEGIN.").

1    ("If the Address Label below contains the winning number and you

2    return it . . . . you'll see on NBC TV that you've just won ten

3    million dollars!") as unqualified assurances that the recipient had

4    won a prize ("the recipient 'has just won Ten Million Dollars!'").

5    857 F. Supp. at 1400-01.  Here, many of Defendants' subject lines

6    do include unqualified assurances, and Plaintiffs have no need to

7    recast the subject lines.  Similarly, the panel in <u>Freeman</u> made

8    specific mention of the fact that the language in the mailers

9    "expressly and repeatedly state[ing] the conditions which must be

10   met in order to win" was situated immediately adjacent to any

11   offers.  68 F.3d 285, 289.

12       This is not to say that Defendants' emails were completely

13   devoid of notice that terms existed, or that the "gifts" may not be

14   unreservedly free.  There were two ways that the emails included

15   qualifications.  First, some of the emails included some sort of

16   qualifying language in the subject heading itself.  Second, all of

17   the emails included fine print[4] at the bottom of the

18   communications, which stated that terms and conditions apply, and

19   which also included links to landing pages that describe the terms

20   and conditions in more detail.  <u>See</u> FAC ¶ 20.

21       Many of the subject lines in Defendants' emails contain a wide

22   variety of potentially "conditional" or "qualifying" phrases, which

23   may, to varying degrees, mitigate any likelihood of misleading a

24   reasonable consumer.  The language in the subject lines is so

25   varied that it could be arranged into a spectrum of sorts.  Some of

26   the statements cited above contain no qualifying language

27   _____

28   [4] The font on the notice of conditions is typically smaller than
     and spatially separate from the body of the emails.

**United States District Court**
For the Northern District of California

whatsoever, and appear to be unconditional promises of rewards or
lucrative positions.  See, e.g., List of Emails Received by Asis at
13 ("Test & Keep a BlackBerry Storm (Paid by Sponsors)").  Moving
down the spectrum, some headings use language that is arguably more
ambiguous as to the existence of terms and conditions, such as "let
us buy you . . . ."  Id. at 10 ("Let us buy you the new Blackberry
Storm").  Others use language that suggests that the recipient may
only have an opportunity to receive a gift.  Id. at 13 ("You could
get the newest BlackBerry Storm phone - [we'll] pay").[5]  Some
subject lines pose questions.  Id. at 16 ("Would you like to test
and keep a designer bag?").  Still other subject lines append
statements like "details apply" or "with participation."  Id. at 8,
27 ("Get the latest BlackBerry Storm phones on our tab (details
apply)!").  At the dismissal stage, this Court will not attempt to
draw an arbitrary line, and state that all subject lines with this
kind of phrasing have no likelihood of deceit, while all subject
lines with that kind of phrasing are likely to deceive.  The Court
is satisfied that a reasonable fact finder could conclude that a
large number of the subject lines could mislead a reasonable
recipient, and it will leave to the fact finder the task of
determining which qualifying language successfully mitigates any
likelihood of deception.

     The Court also concludes that the language of the statute
prevents the Court from considering, at this stage, whether the
likelihood of deception is mitigated by the fine print in the

---

[5] The excerpt actually displays "we‚Äôll" instead of "we'll."
Plaintiffs contend that the character anomaly is indicative of
Defendants' attempt to circumvent spam-blocking software.  Opp'n at
2 n.2.  This could also be caused by an encoding issue in
Plaintiffs' email client or web-browsing software.

**United States District Court**
For the Northern District of California

bodies of the email (which contain vague notices that conditions exist), or by the actual recitation of those terms and conditions on the landing pages (available through a hyperlink in the email's body). Although the panel in <u>Freeman</u> considered "the promotion as a whole" to determine if it was likely to mislead, it was addressing allegations that the promotion violated section 17500 of the FAL. That section does not focus on any particular portion of the allegedly deceitful statement or communication. In contrast, the statute at issue in this suit, section 17529.5(a)(3), focuses on the subject line. It expressly prohibits subject lines that are likely to mislead "about a material fact regarding the contents or subject matter of the message." Cal. Bus. & Prof. Code § 17529.5(a)(3). Section 17529.5(a)(3) does not turn on whether a subject line is true or false, taken in the context of the email as a whole or in light of a hyperlinked page. It asks a very different question: whether the subject line might in fact lead a reasonable person to expect something materially different than the message's actual content or subject matter. In this context, it is inappropriate to suggest that a subject line is not deceptive because of corrective disclaimers in the fine print of the message itself, or terms written in a hyperlinked page.[6]

Of course, a misrepresentation must be material to violate section 17529.5(a)(3). A finder of fact may therefore reasonably

---

[6] Plaintiff's citation to <u>Net2Phone, Inc. v. Superior Court</u>, 109 Cal. App. 4th 583, 588-89 (Ct. App. 2003) is inapposite. That case found that a forum selection clause in a hyperlinked document might be enforceable. The issue here, as framed by section 17529.5, is not whether the terms and conditions might be enforceable, but whether the "contents and subject matter" of the message and the landing page might be materially different from what a reasonable recipient may expect, based on the subject lines.

10

consider the body of an email or a hyperlinked page in determining whether misrepresentations in the subject lines were actually material.  This is an inquiry best left for the finder of fact.

The Court finds that Plaintiffs have plausibly alleged that the emails in question contained subject lines that were likely to mislead a recipient acting reasonably under the circumstances.  While it is not clear that a finder of fact will ultimately conclude that each and every email implicated by the FAC has a likelihood of material deception, Plaintiffs have met their burden at the dismissal stage.

> 2.   <u>Defendants' Critique of the Federal Trade Commission Guidance</u>

A substantial amount of Defendants' supporting memorandum addresses guidance issued by the Federal Trade Commission ("FTC"), 16 C.F.R. § 251, which sets out a standard for the use of the term "free" in ads and product labeling.  <u>See</u> Mot. at 4-5.  Defendants do not raise this guidance as an argument that vindicates their subject lines; rather, they are responding to an argument that Plaintiffs have raised in their Complaint and FAC, and which they argued in their Opposition to the previous Motion to Dismiss.  Plaintiffs cite this guidance on several occasions, and suggest that California courts look to this guidance to help determine when the term "free" or similar terms are misused.  <u>See</u> Docket No. 7 ("Opp'n to First Motion to Dismiss") at 14; FAC. ¶ 18.

This issue was fully briefed in connection with the first motion to dismiss.  This Court previously concluded that Plaintiffs had sufficiently alleged that the subject headings were false, Dec. 4, 2009 Order at 10-11.  The Court deliberately did not rely upon

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    16 C.F.R. § 251 in reaching this conclusion.  By this Order, the

2    Court reaffirms its earlier conclusion, and it now explicitly

3    declines to rely upon 16 C.F.R. § 251.  Defendants' attempt to take

4    issue with an argument made by Plaintiffs, but not adopted by this

5    Court, does not disturb this Court's ruling.

6    **B.   Whether Plaintiffs Have Adequately Pled Defendants'
          Knowledge**

7

8         Section 17529.5(a)(3) forbids "any person or entity" from

9    advertising in California through an email advertisement that has a

10   subject line "that a person knows" is likely to be mislead.  Cal.

11   Bus. & Prof. Code § 17529.5(a)(3).  Defendants claim that

12   Plaintiffs have failed to plausibly plead that Defendants "knew"

13   that the email subject lines were likely to deceive, because

14   Defendants did not send the emails themselves.  Instead, they

15   "contract with third parties to send lawful commercial email

16   advertisements under circumstances that do not permit the

17   examination of every such advertisement."  Mot. at 11.

18        To support their position, Plaintiffs cite to <u>Asis Internet</u>

19   <u>Services v. Optin Global, Inc.</u>, No. 05-5124, 2008 U.S. Dist. LEXIS

20   34959, *58 (N.D. Cal. April 29, 2008).  The court in <u>Optin Global</u>

21   rejected, on summary judgment, the plaintiff's section 17529.5

22   claims because the defendant "did not send the offending spam.  Nor

23   did it knowingly 'procure' the spam . . . ."  <u>Id.</u>  At most, the

24   defendant in that case had benefitted from the spam emails that

25   other parties had sent, and the Court concluded that this was

26   insufficient to establish that the defendant had "advertised" under

27   section 17529.5.  <u>Id.</u>  This case does not help Defendants.  The

28   decision was issued in response to cross motions for summary

1   judgment, and not at the dismissal stage.   In <u>Optin Global</u> the

2   court was able to rely on the structure of the defendant's

3   relationship with the entities that had sent the emails, which may

4   or may not have been the same as the relationships that Defendants

5   had with the senders in this suit.   <u>See</u> <u>id.</u> at *5-7.   At this stage

6   of the litigation, such information is not part of the record that

7   is available to this Court.   This Court is only aware that

8   Defendants readily admit that they used "contractors to send emails

9   that entice consumers to visit" their web pages.   Mot. at 11-12.

10  This is sufficient to render Plaintiff's allegations, that

11  Defendants knew that the subject lines of the emails were likely to

12  deceive the recipients, plausible.

13       Defendants also fault Plaintiffs for failing to successfully

14  allege that Defendants acted as part of a conspiracy.   Mot. at 12-

15  14.   The Court fails to see how such allegations are a necessary

16  element in Plaintiffs' cause of action.

17       **C.**   **Whether Plaintiffs Have Standing**

18       Defendants now argue that Plaintiffs fail to meet the standing

19  requirements of Proposition 64, which "amended the unfair

20  competition law to provide that a private plaintiff may bring a

21  representative action under [the UCL or the FAL] only if the

22  plaintiff has 'suffered injury in fact and has lost money or

23  property as a result of such unfair competition'. . . ."   <u>Arias v.</u>

24  <u>Super. Ct.</u>, 46 Cal. 4th 969, 977-78 (2009).   As California's

25  Supreme Court has described:

26             Proposition 64 accomplishes its goals in
               relatively few words.   The measure amends section
27             17204 [as well as section 17535], which
               prescribes who may sue to enforce the UCL [and
28             FAL], by deleting the language that had formerly

13

United States District Court
For the Northern District of California

> authorized suits by any person "acting for the
> interests of itself, its members or the general
> public," and by replacing it with the phrase,
> "who has suffered injury in fact and has lost
> money or property as a result of [violation of
> this chapter]."

Californians for Disability Rights v. Mervyn's, LLC, 39 Cal. 4th

223, 228 & n.2 (2006) (language in brackets added to conform with

Cal. Bus. & Prof. Code § 17535, which was subject to "identical

changes").  The particular sections of the UCL and FAL that

Proposition 64 amended were the provisions that authorize litigants

to pursue equitable relief, and which authorize courts to grant

such relief.  See Cal. Bus. & Prof. Code §§ 17203, 17204, 17535.

Plaintiffs who seek injunctive or other equitable relief under the

UCL or FAL therefore necessarily invoke the provisions amended by

Proposition 64, by relying on those sections.

    The problem with Defendants' argument is that section 17529.5

includes independent, non-exclusive standing and remedy provisions,

which explicitly authorize "electronic mail service provider[s]"

("EMSPs") to bring a suit for liquidated damages against an entity

that violates section 17529.5.[7]  Cal. Bus. & Prof. Code

§ 17529.5(b).  This section was not amended by Proposition 64.  It

contains no requirement that EMSPs suffer injury in fact, or lose

money or property as a result of a violation.  By invoking this

section, and by not seeking any injunctive relief under section

17535 of the FAL, or any other provision that was amended by

---

[7] Section 17529.5 also may be enforced by the Attorney General or
"[a] recipient of an unsolicited commercial e-mail advertisement."
Cal. Bus. & Prof. Code § 17529.5(b)(1)(A).  The liquidated damages
provision authorizes recovery of $1000 per offending email, up to
one-million dollars "per incident," which is reduced tenfold if the
Court finds that the defendant took care to establish procedures
that prevent violations.  Id. § 17529.5(b)(1)(B)(ii), (b)(2).

14

1  Proposition 64, Plaintiffs have avoided the standing requirements

2  imposed by the ballot initiative.

3      Defendants argue that this Court should nevertheless impose

4  the requirements of Proposition 64 upon Plaintiffs in this case,

5  and conclude that EMSPs must show that they have "suffered injury

6  in fact and [have] lost money or property," just like a FAL

7  plaintiff who seeks injunctive relief -- even though the special

8  standing provisions of section 17529.5(b) clearly lack this

9  requirement.[8]  Mot. at 14-16.  Defendants support this argument by

10  citing "the clear intent of the electorate" who passed Proposition

11  64.  Id. at 15.  The Court must therefore examine the intent and

12  purpose behind Proposition 64, to determine if it is incompatible

13  with the special standing provision of section 17529.5.  See Credit

14  Suisse First Boston Corp. v. Grunwald, 400 F.3d 1119 (9th Cir.

15  2005) (when interpreting California law, courts may consider

16  whether "literal meaning of a statute comports with its purpose"

17  (citation omitted)).

18      This invitation, to effectively rewrite a provision in the

19  California Business and Professions Code, is not to be taken

20  lightly.  As a California Court of Appeal has explained:

21          When a later statute supersedes or substantially
            modifies an earlier law but without expressly
22          referring to it, the earlier law is repealed or
            partially repealed by implication.  The courts
23          assume that in enacting a statute the Legislature

24  ────────────────────────────────

[8] This Court previously found that Plaintiffs had stated sufficient

25  harm to establish Article III standing.  Dec. 4, 2009 Order at 11;
    see also Asis Internet Servs. v. Consumerbargaingiveaways, LLC, 622

26  F. Supp. 2d 935, 939-40 (N.D. Cal. 2009) ("Plaintiffs, as internet
    service providers, certainly suffer Article III injury from false

27  or misleading advertising in spam email messages: spam annoys their
    customers, thus hurting business, and forces them to expend

28  resources to filter and combat the spam.").  Defendants have not
    challenged this conclusion.

15

United States District Court
For the Northern District of California

1    was aware of existing, related laws and intended
     to maintain a consistent body of statutes.  Thus
2    there is a presumption against repeals by
     implication; they will occur only where the two
3    acts are so inconsistent that there is no
     possibility of concurrent operation, or where the
4    later provision gives undebatable evidence of an
     intent to supersede the earlier; the courts are
5    bound to maintain the integrity of both statutes
     if they may stand together.

6

7  People v. Bustamante, 57 Cal. App. 4th 693, 699 (Ct. App. 1997)

8  (quoting Sacramento Newspaper Guild v. Sacramento County Bd. of

9  Supervisors, 263 Cal. App. 2d 41, 54-55 (Ct. App. 1968)) (citations

10 omitted).  These principles apply to initiative measures as well as

11 to legislative amendments.  Id. at 699 n.5.

12     The language of Proposition 64 and the description of the

13 effects of the ballot measure, as provided in the Official Voter

14 Information Guide ("OVIG"), does create some tension with section

15 17529.5.  See Defendants' Request for Judicial Notice ("Defendants'

16 RJN"), Docket No. 21, Ex. B ("OVIG") at 38, 109.[9]  In particular,

17 the OVIG explained that, without the measure, a plaintiff was "not

18 required to show that he/she suffered any injury or lost money or

19 property. . . .  This measure prohibits any person . . . from

20 bringing a lawsuit for unfair competition unless the person has

21 suffered injury or lost money or property."  Id. at 38.  The

22 enacted provision also states that the pre-Proposition 64 law was

23 "being misused by some private attorneys who . . . [f]ile lawsuits

24 where no client has been injured in fact."  Id. at 109.  It also

25 expressed concerns that abusive attorneys were filing suits for

26 clients who had never "viewed the defendant's advertising . . . ."

27
---
28 [9] The Court may take judicial notice of the OVIG, a document of
    public record.  See United States v. 14.02 Acres, 547 F.3d 943, 955
    (9th Cir. 2008).

16

**United States District Court**
For the Northern District of California

1    Id.

2         Nevertheless, this Court is not persuaded that the special

3    standing provisions of section 17529.5 are incompatible with the

4    amendments of Proposition 64.  This is because the standing

5    provisions of this section were unique prior to the passage of

6    Proposition 64.  Under the UCL and FAL, both before and after the

7    passage of Proposition 64, plaintiffs are typically restricted to

8    seeking injunctive or other equitable relief.  See In re Tobacco II

9    Cases, 46 Cal. 4th 298, 312 (2009) ("A UCL action is equitable in

10   nature; damages cannot be recovered." (quotation marks and citation

11   omitted)).  The provisions that authorized this kind of relief

12   "expressly conferred standing to sue upon 'any person acting for

13   the interests of . . . the general public' without requiring a

14   showing of actual injury."  Branick v. Downey Savings & Loan Assn.,

15   39 Cal. 4th 235, 241-42 (2006) (quoting pre-Proposition 64 standing

16   provision in section 17204).  This was an extremely broad class of

17   entities (i.e., the general public), and Proposition 64 was clearly

18   aimed at curbing the nearly limitless scope of standing under the

19   FAL, as well as the abusive litigation that it allowed.  In

20   contrast, section 17529.5 authorized liquidated damages only for

21   the Attorney General, EMSPs, and the actual recipients of the

22   unsolicited and prohibited emails -- it was never open to the

23   general public.  Even before Proposition 64, the class of entities

24   that could bring suit as potential plaintiffs under section

25   17529.5(b)(1)(B)(2) was significantly more limited than the class

26   of entities that could seek injunctive relief for any violation of

27

28

17

**United States District Court**
For the Northern District of California

1   the FAL.[10]   Moreover, the target of the statute is much narrower

2   than that of the UCL and FAL -- it is crafted to discretely target

3   email advertisers, rather than businesses or advertisers generally.

4   It was therefore never subject to the same scope of abuse as the

5   general provisions of the UCL and FAL.

6       This Court will not take it upon itself to rewrite the plain

7   language of section 17529.5(b)(1)(A) to include a requirement for

8   "lost money or property" as a prerequisite for standing.   In the

9   absence of clear evidence that Proposition 64 was intended to

10  modify this provision, the Court finds that it need not take such

11  drastic action.   Section 17529.5 targets a discrete wrong, and

12  provides standing requirements that are distinct from those of

13  general FAL claims.   These requirements were not clearly addressed

14  or disturbed by Proposition 64 or the ballot initiative material

15  that this Court has reviewed.

16      D.   **Whether Plaintiff's Claims are Preempted by the CAN-SPAM**

17      **Act**

18      The CAN-SPAM Act[11] was intended to create a national standard

19  for regulating mass-commercial emails, and to that end, it

20  "supersedes any statute . . . except to the extent that any such

21  statute . . . prohibits falsity or deception in any portion of a

22  commercial electronic mail message . . . ."  15 U.S.C.

23  § 7707(b)(1).  Defendants argue that this provision only saves

24  state claims that include each and every element of common law

25  ─────────────────

26  [10] Prior to Proposition 64, other entities could conceivably have
    brought suit for violations of section 17529.5(a), as long as they
    sought only injunctive relief under section 17535, but not if they
27  sought liquidated damages under section 17529.5(b).

28  [11] "CAN-SPAM" stands for "Controlling the Assault of Non-Solicited
    Pornography and Marketing."

**United States District Court**
For the Northern District of California

1   fraud, including reliance and damages.  Mot. at 11-13.

2       In California, the elements of a fraud claim include (a)

3   misrepresentation; (b) knowledge of falsity; (c) intent to defraud;

4   (d) justifiable reliance; and (e) resulting damage.  Lazar v.

5   Super. Ct., 12 Cal. 4th 631, 638 (1996).  In this suit, Plaintiffs

6   have not pled the last two elements, reliance and damages.  These

7   elements are not required by the FAL, under which "one need not

8   plead and prove the elements of a tort.  Instead, one need only

9   show that members of the public are likely to be deceived."

10  Freeman, 68 F.3d at 289.  Section 17529.5(a)(3) allows suits

11  against advertisers who knowingly send emails with subject lines

12  that are "likely to mislead a recipient."  Cal. Bus. & Prof. Code

13  § 17529.5(a)(3).  It allows selected entities to bring suits for

14  statements that are merely "potentially" misleading -- i.e.,

15  statements upon which nobody has relied, and which have caused no

16  "damages" by or through the falsehoods themselves -- so long as the

17  plaintiff can prove a "likelihood" of deception.  The question is

18  whether this sufficiently targets "falsity or deception" to avoid

19  preemption under 15 U.S.C. § 7707(b)(1).

20          1.   Whether Virtumundo Requires State Statutes to
                 Include the Elements of Reliance and Damages

21

22      Defendants rely upon Gordon v. Virtumundo, 575 F.3d 1040 (9th

23  Cir. 2009), which they claim controls the preemption question at

24  hand.  Mot. at 11-12.  Virtumundo considered a cause of action and

25  a Washington statute that are both distinguishable from the claim

26  that Plaintiffs now advance under section 17529.5.  Virtumundo

27  affirmed a summary judgment against a plaintiff who sought to hold

28  the defendants liable for sending messages that did not clearly

**United States District Court**
For the Northern District of California

1  display the identity of the sender.  The court concluded that this

2  amounted to allegations that the defendants sent messages that

3  contained, "at best, incomplete or less than comprehensive

4  information regarding the sender."  575 F.3d at 1064.  Assuming

5  that such activity violated the Washington statute, this did not

6  amount to "falsity or deception" as used in the savings provision

7  because "[t]here is of course nothing inherently deceptive in

8  Virtumundo's use of fanciful domain names."  Id. at 1063.  The

9  plaintiff's "alleged header deficiencies relate to, at most, non-

10 deceptive statements or omissions . . . ."  Id. at 1064.  The panel

11 concluded that "[s]uch technical allegations . . . find no basis in

12 traditional tort theories and therefore fall beyond the ambit of

13 the exception language in the CAN-SPAM Act's express preemption

14 clause."  Id.  Put otherwise, the panel held that any statute

15 requiring that an advertiser's "name expressly appear in the 'from

16 lines'" of an email is preempted under the CAN-SPAM Act because it

17 is not based on "traditional tort theories."  Id.

18     Prior to Virtumundo, discussion of this question centered

19 around a Fourth Circuit decision, Omega World Travel, Inc. v.

20 Mummagraphics, Inc., 469 F.3d 348 (4th Cir. 2006), which was, at

21 the time, "the only federal circuit court decision addressing

22 preemption of state law claims by the CAN-SPAM Act."  Virtumundo,

23 575 F.3d at 1061.  Much like Virtumundo, the Fourth Circuit had

24 concluded that "falsity and deception" referred to "traditionally

25 tortious or wrongful conduct" rather than "errors that do not sound

26 in tort," and found a state statute, which reached merely erroneous

27 conduct by an email advertiser, to be preempted.  Omega, 469 F.3d

28 at 354.  The reasoning of the Fourth Circuit informed much of the

**United States District Court**
For the Northern District of California

subsequent discussion that took place among the district courts of California.  Nevertheless, as this Court previously discussed, a split existed in this district as to whether plaintiffs could only plead "falsity or deception" by pleading all of the elements of common law fraud, or whether the CAN-SPAM Act spared section 17529.5 plaintiffs from pleading reliance and damages under state statutes.  See Dec. 4, 2009 at 4-5; compare Asis Internet Servs. v. Vistaprint USA, Inc., 617 F. Supp. 2d 989 (N.D. Cal. 2009) (section 17529.5 is not preempted, even though it does not require showing of reliance or damages) and Asis Internet Servs. v. Consumerbargaingiveaways, LLC, 622 F. Supp. 2d 935, 940-44 (N.D. Cal. 2009) (same) with Hoang v. Reunion.Com, Inc., No. 08-3518, 2008 U.S. Dist. LEXIS 85187, *4-6 (N.D. Cal. Oct. 6, 2008) (finding that CAN-SPAM only allows state causes of action based on common law fraud and dismissing section 17529.5 complaint that does not allege reliance and damages).

Virtumundo did not clearly resolve this split.  It "reach[ed] the same conclusion" as Omega, and held that the CAN-SPAM Act forbids state statutes that reach non-deceptive practices.  Virtumundo, 575 F.3d at 1061-62.  Since Virtumundo, no federal authority citing that case specifically addresses the question that is now before the Court.[12]  As submissions by both parties indicate, state trial courts have continued to disagree on this

---

[12] Gordon v. Commonwealth Mktg. Group, Inc., found a plaintiff's claims under Washington state law preempted because he had "not adequately pleaded nor developed the record to allege fraud," but the court did not discuss whether the plaintiff's allegations sounded in "deception" or "mere error."  No.08-5074, 2009 U.S. Dist. LEXIS 105217, *2 (E.D. Wash. Dec. 29, 2009).  Notably, the plaintiff in this suit was also the plaintiff in Virtumundo.

1  topic since the decision in <u>Virtumundo</u> was issued.  <u>See</u>, <u>e.g.</u>,

2  <u>Balsam v. Trancos, Inc.</u>, Civ. No. 471797 (Cal. Super. Ct., County

3  of San Mateo, Jan. 15, 2010) (tentative statement of decision)

4  (finding section 17529 claim not preempted); <u>Silverstein v. Liquid</u>

5  <u>Minds LLC</u>, B.C. 375173 (Cal. Super. Ct., County of Los Angeles,

6  August 18, 2009) (minute order) (finding finding section 17529.5

7  preempted because not based on traditional fraud theory).[13]

8  <u>Virtumundo</u> did not reject the plaintiff's claims because they did

9  not include the elements of reliance and damages, or because his

10 theory was not based on common law fraud per se.  It rejected the

11 plaintiff's claims because it found that Washington's prohibition

12 reached "non-deceptive statements," and was therefore not

13 sufficiently grounded in "traditional tort theories such as claims

14 arising from fraud or deception."  <u>See</u> <u>Virtumundo</u>, 575 F.3d at

15 1063-64.  Therefore, while it is clear that "the word 'deception'

16 certainly denotes something more than immaterial inaccuracies or

17 inadvertent mistakes," <u>id.</u> at 1062, it is not clear that the word

18 restricts states to creating causes of action that require a

19 showing of reliance and damages.

20     Unlike the plaintiff in <u>Virtumundo</u>, Plaintiffs' section

21 17529.5 claim is not based on merely "incomplete" information.

22 Instead, Plaintiffs can plausibly claim that there is something

23 "inherently deceptive" in Defendants' alleged practices.  <u>C.f.</u>, <u>id.</u>

24 at 1063 ("There is of course nothing inherently deceptive in

25 Virtumundo's use of fanciful domain names.").  Plaintiffs' theory

26

27 [13] These Orders are attached as Exhibit C to Plaintiffs' Request
    for Judicial Notice, Docket No. 22-4 (<u>Balsam</u>), and Exhibit A to
28 Defendants' RJN (<u>Silverstein</u>).

**United States District Court**
For the Northern District of California

1    is grounded in a much more substantial variety of intentional

2    deception: Plaintiffs allege that Defendants represented something

3    as "free" when it was in fact not.

4        Section 17529.5(a)(3) is also quite distinct from the

5    Washington statute in <u>Virtumundo</u>.  This provision does not prohibit

6    any conduct that is not prohibited by the CAN-SPAM Act.  <u>Compare</u> 15

7    U.S.C. § 7704(a)(2) <u>with</u> Cal. Bus. & Prof. Code § 17529.5(a)(3).[14]

8    Neither the CAN-SPAM Act nor 17529.5 require that plaintiffs plead

9    each and every element of fraud.  15 U.S.C. § 7704(a)(2); <u>Asis</u>

10   <u>Internet Servs. v. Optin Global, Inc.</u>, No. 05-5124, 2006 U.S. Dist.

11   LEXIS 46309, *13 (N.D. Cal. June 30, 2006) ("[T]he required

12   elements of a claim by an internet access provider under the CAN-

13   SPAM Act . . . do not include all of the elements of common law

14   fraud.").  Both statutes prohibit what might be termed "attempted"

15   or "potential" deception, i.e., subject lines that are only "likely

16   to mislead," without regard to whether or not they have actually

17   ever misled anyone.  The question still remains whether this

18   prohibition, when found in a state statute, is sufficiently based

19   in "traditional tort theories" to avoid preemption, or whether the

20   statute must be read to include the requirement that plaintiffs

21   plead reliance and damages to meet this burden.

22   ///

23   ///

24   ――――――――――――――――――

[14] CAN-SPAM applies to emails where "a subject heading of the

25   message would be likely to mislead a recipient, acting reasonably
     under the circumstances, about a material fact regarding the

26   contents or subject matter of the message."  15 U.S.C.
     § 7704(a)(2).  Section 17529.5(a)(3) applies to emails with "a

27   subject line that a person knows would be likely to mislead a
     recipient, acting reasonably under the circumstances, about a

28   material fact regarding the contents or subject matter of the
     message."

2. <u>Whether Congress Intended for "Falsity or Deception"</u>
<u>to Be Limited to Pure Forms of Common Law Fraud</u>

The explicit language of the preemption clause betrays no intention by Congress to limit state regulation to the simple codification of common law fraud in its purest form. Both the preemption clause itself and the relevant legislative history suggest that Congress intended to allow states to regulate more than simple fraud. The relevant authorities, including <u>Virtumundo</u>, refer disjunctively to "falsity or deception" and "fraudulent or deceptive . . . subject lines." 15 U.S.C. § 7707(b)(1); S. Rep. No. 108-102, at 21; <u>Virtumundo</u>, 575 F.3d at 1061-63. The term "deception" would be redundant (if not misleading) if Congress meant to limit state regulation solely to common law fraud. <u>See</u> <u>Consumerbargaingiveaways</u>, 622 F. Supp. 2d at 942 ("Congress, however, is certainly familiar with the word "fraud" and choose not to use it; the words "falsity or deception" suggest broader application."). This language supports a broad reading of the exemption within the savings clause, which this Court is obliged to credit because "express preemption statutory provisions should be given narrow interpretation." <u>Virtumundo</u>, 575 F.3d at 1060 (quoting <u>Air Conditioning & Refrigeration Inst. v. Energy Res.</u> <u>Conservation & Dev. Comm'n</u>, 410 F.3d 492, 496 (9th Cir. 2005)).

As the <u>Virtumundo</u> Court observed, the justification for the CAN-SPAM Act's preemptive effect is to prevent state and local lawmakers from "manipulat[ing] that standard to create more burdensome regulation." 575 F.3d at 1063. But adding the traditional fraud elements of reliance and damages does not add anything to Congress's efforts to create a uniform system of

United States District Court
For the Northern District of California

regulation governing email advertisements.  Indeed, requiring these elements would not in any way affect the scope of tortious behavior that is prohibited by section 17529.5.  This is because the elements of reliance and damages do not speak to the substance of the emails or subject lines that are prohibited.

The difference between deception in the strict "fraud" sense, and deception without reliance and damages, is merely the difference between actual and attempted fraud.  Once an advertiser makes a material, intentional misrepresentation, whether the elements of reliance and damages manifest in any instance depends upon the naiveté, vulnerability, or circumstance of the recipient. Congress explicitly crafted the savings clause so that preemption would turn on whether a state staute targets the behavior of advertisers:  "[State s]tatutes that prohibit fraud and deception in e-mail do not raise the same concern [of inconsistency], because they target behavior that a legitimate business trying to comply with relevant laws would not be engaging in anyway."  S. Rep. No. 108-102, at 22 (2003).  This suggests that states may regulate deceptive behavior without consideration of conditions that do not turn on the behavior of advertisers.

While the elements of reliance and damages do not affect the nature of the behavior that is prohibited, they do affect who may properly bring suit for a violation of the provision.  Requiring these elements would therefore have one clear practical consequence:  It would limit the scope of entities that are entitled to bring suit under section 17529.5.  It would restrict enforcement suits to the (presumably more rare) case where a plaintiff had actually been duped by a misleading subject line.

1    The bulk of deceptive email would go unpunished, until such an
2    email happened to mislead someone with the resources and
3    wherewithal to pursue a private claim.  Removing the elements of
4    reliance and damages, and allowing the punishment of attempted as
5    well as actual fraud, allows the states to enact more effective
6    enforcement mechanisms without expanding the scope of prohibited
7    behavior beyond that which is tortious in nature.

8        Congress authorized California to "prohibit[] falsity or
9    deception in any portion of a commercial electronic mail message,"
10   15 U.S.C. § 7707(b)(1), and it indicated no intent to limit the
11   mechanisms that California may authorize to enforce such
12   prohibitions.  The Court finds no basis for concluding that
13   California is barred from deterring deceptive practices by, for
14   example, authorizing its Attorney General to bring civil suits
15   against advertisers who have attempted to commit email fraud upon
16   its citizens.  Nor is it barred from authorizing EMSPs to bring
17   private actions against those who have attempted fraud upon their
18   customers.

19       In short, the purpose of the preemption clause is to achieve
20   uniform regulation with respect to lawful advertisement activity,
21   while allowing states to continue regulation the narrow field of
22   "falsity and deception."  15 U.S.C. § 7707(b)(1); Virtumundo, 575
23   F.3d at 1063.  Congress intended that preemption turn on the nature
24   of the advertiser behavior that is being regulated.  See S. Rep.
25   No. 108-102, at 22.  This can be achieved without requiring
26   plaintiffs, under every state statute aimed at deceptive email, to
27   plead reliance and damages.  California may therefore prohibit
28   emails that result in actual deception, and it may prohibit emails

26

**United States District Court**
For the Northern District of California

1  that attempt to deceive (just as the CAN-SPAM Act does). It may

2  also enforce these prohibitions by authorizing EMSPs to bring suit,

3  including EMSPs that have not relied upon the allegedly misleading

4  email subject lines.

5      This Court is satisfied that, because section 17529.5(a)(3)

6  prohibits only behavior that Congress authorized California to

7  prohibit, it is not preempted by the CAN-SPAM Act.  As long as

8  Plaintiffs can establish that Defendants were responsible for

9  making knowing and material misrepresentations (as required by

10  section 17529.5(a)(3)), their claim will sound in "falsity or

11  deception" and will not be preempted by the CAN-SPAM Act.

12  Plaintiffs have pled a claim that is sufficiently grounded in

13  "traditional tort theories," as required by <u>Virtumundo</u> and 15

14  U.S.C. § 7707(b)(1).

15          3.   <u>Whether the Broad Enforcement Permitted by Section</u>
                 <u>17529.5 Conflicts With the CAN-SPAM Act</u>
16

17      The Court is compelled to comment on the difference in

18  standing conferred by section 17529.5 and the CAN-SPAM Act.

19  Plaintiffs could not have brought this claim under the CAN-SPAM

20  Act.  Several nearly identical suits brought by Plaintiff Asis

21  under the CAN-SPAM Act have been dismissed because they failed to

22  meet that Act's particular standing requirements.  See, e.g., <u>ASIS</u>

23  <u>Internet Servs. v. Azoogle.com, Inc.</u>, No. 08-15979, 2009 U.S. App.

24  LEXIS 26232, *2-3 (9th Cir. Dec. 2, 2009).  As the Ninth Circuit

25  has observed, the CAN-SPAM Act "conferred standing only on a narrow

26  group of possible plaintiffs." <u>Virtumundo</u>, 575 F.3d at 1049.  The

27  language of the federal statute authorizes internet access service

28  providers ("IAS providers") to bring suit against advertisers only

1   if they have been "adversely affected by a violation" of the CAN-

2   SPAM Act.  15 U.S.C. § 7706(g)(1).  The Ninth Circuit has

3   interpreted this language to require "something beyond the mere

4   annoyance of spam and greater than the negligible burdens typically

5   borne by an IAS provider in the ordinary course of business."  Id.,

6   575 F.3d at 1053.  However, section 17529.5(b) lacks the "adversely

7   affected" language of the CAN-SPAM Act.

8       This raises the question:  May California issue a statute with

9   prohibitions that are parallel to those found in the CAN-SPAM Act,

10   but which authorizes a broader class of plaintiffs to bring suit,

11   without disturbing "the fine balance struck by Congress?"  Id. 575

12   F.3d at 1049.  The limitations that Congress placed on standing for

13   IAS providers were certainly deliberate.  "Congress's intent was to

14   limit enforcement actions to those best suited to detect,

15   investigate, and, if appropriate, prosecute violations of the CAN-

16   SPAM Act -- those well-equipped to efficiently and effectively

17   pursue legal actions against persons engaged in unlawful practices

18   and enforce federal law for the benefit of all consumers."  See

19   Virtumundo, 575 F.3d at 1049-50.  In concurring with the Virtumundo

20   decision, Judge Gould expressed his belief that Congress crafted

21   the standing language of the Act to avoid suits by "litigation

22   factories," where "the purported harm is illusory and more in the

23   nature of manufactured circumstances in an attempt to enable a

24   claim."  Id. at 1067-68 (Gould, J., concurring).

25       By eschewing the standing requirements of the CAN-SPAM Act,

26   section 17529.5 allows a broader scope of plaintiffs -- including

27   Asis and Foggy -- to bring suit against email advertisers.

28   However, to the extent that Plaintiffs seek only to enforce section

17529.5(a)(3), the section remains within the narrow subject matter that Congress has explicitly left to state regulation.  The CAN-SPAM Act's preemption provision grants states the authority to regulate certain behavior, and specifically to "prohibit[] falsity or deception in any portion of a commercial electronic mail message," without regard to the methods that states may use to enforce these prohibitions.  15 U.S.C. § 7707(b)(1).  It would be both unnecessary and disingenuous to attempt to impose parity in the standing provisions between the two statutes, by imposing a narrow reading on Congress's express reservation of this right for the states.[15]  This Court will not find that Congress has superseded California's power to authorize this kind of enforcement mechanism without a showing that this was Congress's "clear and manifest purpose," particularly "when Congress has legislated in a field traditionally occupied by the States."  See Altria Group, Inc. v. Good, 129 S. Ct. 538, 543 (2008).  The Court therefore finds that section 17529.5 does not overstep the scope of authority designated to California under the CAN-SPAM Act.

///

///

///

///

---

[15] Requiring plaintiffs to plead reliance and damages would not impose parity between the statutes.  IAS providers who have never relied upon a deceptive subject line may be "adversely affected" by emails with potentially misleading subject lines, and can bring a suit identical to this one under the CAN-SPAM Act, if they experience "network crashes, higher bandwidth utilization, and increased costs for hardware and software upgrades, network expansion and additional personnel."  Virtumundo, 575 F.3d at 1053 (quoting Asis Internet Servs. v. Active Response Group, No. 07-6211, 2008 U.S. Dist. LEXIS 60535, *12 (N.D. Cal. July 30, 2008).

United States District Court
For the Northern District of California

1   **III. <u>CONCLUSION</u>**

2      For the reasons stated above, Defendants' Motion to Dismiss is

3   DENIED.

4

5      IT IS SO ORDERED.

6

7      Dated:  April 1, 2010



8                                   UNITED STATES DISTRICT JUDGE